THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CLIFFORD THOMAS, Defendant-Appellant.

First District (2nd Division)   No. 82—645

Opinion filed July 5, 1983.

Giovannini & Goldberg, of Chicago (Dennis A. Giovannini and Herbert L. Goldberg, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Bruce A. Cardello, and Matthew J. Egan, Assistant State's Attorneys, of counsel), for the People.

JUSTICE STAMOS delivered the opinion of the court:

After a jury trial, defendant Clifford Thomas was convicted of murder. A sentence of 40 years was entered on the verdict. Defendant's sole contention on appeal is that he was denied his right to a fair trial as a result of improper comments made by the prosecutors in closing and rebuttal arguments.

Theodus James was fatally shot on the night of August 20, 1981, while he was standing near a tavern at Huron and Avers streets in Chicago. Terry Coulter testified for the State that he, Jerome Steele, Kathy Steele, and defendant were riding in a station wagon that night, and that they drove to Huron and Avers. Kathy ·Steele left the

car, went near the tavern, and began to speak with the victim. Defendant left the car and approached the two. Kathy returned to the car while defendant and the victim talked. Defendant then struck the victim in the face with a pistol. The victim turned and went toward the door of the tavern, and defendant shot him in the back. Defendant got back into the car and he, Coulter, and the Steeles drove back to the apartment where defendant was living with Kathy Steele. Coulter also testified that he saw defendant give the gun to another man at the apartment that same night.

Melvin McGowan testified that he, his brother Charles, and the victim went to the tavern at Huron and Avers on the night of August 20, 1981. Melvin went into the tavern, where he was later joined by his brother while the victim stayed outside. He looked out the window and saw the victim talking to Kathy Steele, who was formerly the victim's girlfriend. Melvin looked out the window again and saw Kathy step away from the victim as a man who he later identified as defendant approached. Defendant struck the victim in the face with a pistol. Melvin walked back towards the bar and told his brother that "something is fixing to happen." Melvin heard a shot and ducked under a table. He saw the victim run into the bar toward the washroom. Melvin went into the washroom and saw the victim lying on the floor bleeding from his chest.

Charles McGowan testified that he saw the victim talking to Kathy from the tavern window. He stated that after Melvin told him that a man was hitting the victim with a gun, he looked out and saw a man strike the victim with a pistol. He then went to the tavern door and saw the man shoot the victim in the back. As he followed the victim into the tavern, he saw the man and Kathy get into a station wagon with two other people and drive away.

Tyrone Kilgore testified that the victim and the McGowan brothers had stopped by his house on the night of the shooting. After they had left, Coulter, Jerome and Kathy Steele, and an unknown male stopped at his house and asked about the victim's whereabouts. Kilgore later identified a photo of defendant as the man with Coulter and the Steeles.

After the State rested its case in chief, the court granted a motion *in limine* which precluded the introduction of evidence that the victim had been convicted of possession of a controlled substance and that the Vice Lords street gang had threatened the victim with death if he continued to sell drugs in the area of Huron and Avers. The defense had made an offer of proof as to those threats, and of the fact that Terry Coulter and Jerome Steele were members of the Vice

Lords.

Defendant's sister testified that defendant was at home on the night of the shooting. She stated that she left for work that night at approximately 11 p.m. and that shortly before she left defendant had received a telephone call from their mother, who was in the hospital. She stated that on that date defendant was living with Kathy Steele, whom he had recently married.

On February 5, 1982, the defense continued its case in chief. Defendant's mother testified that she spoke with defendant on the telephone on the night of the shooting at about 10 p.m.

The defense also called Odell Jennings and Torrence Evans. Both witnesses testified that they were in a holding cell awaiting court on January 11, 1982, when they were approached by Terry Coulter. Coulter identified himself as a member of the Vice Lords by a hand sign and stated that he was testifying against defendant primarily because he thought defendant was a member of the Disciples, and because the police had told him that if he did not testify, he or another Vice Lord would be accused of the murder. Evans testified that he was a member of the Disciples, and that he told Coulter that defendant was not a Disciple, after which Coulter stated that he would straighten things out.

On cross-examination, both witnesses testified that they had been visited in jail by defense counsel on February 3. Both stated that they were represented by other counsel. Evans said that he had not seen defense counsel sign in as his attorney, and an objection was sustained when the same question was asked of Jennings. Evans also denied that defense counsel told him how to act on the stand.

Jerome Steele testified that he was Kathy Steele's brother and defendant's brother-in-law. He stated that he was a "five point general" in the Vice Lords, and that the primary rivals of that gang were the Disciples. Steele testified that the primary rules of the Vice Lords were to protect each other and not to allow the sale of drugs.

Steele stated that on the night of the shooting he and Kathy drove to Huron and Avers. Kathy left the car to speak with the victim and the victim "got shot." He and Kathy drove away, picked up Kathy's children and then picked up defendant. Steele denied shooting the victim.

The jury found defendant guilty of murder, and sentence was entered on the verdict. Defendant appeals, contending that he was denied a fair trial by virtue of improper remarks of the prosecutors during closing and rebuttal arguments.

■■ ■ Initially, we note that defendant's post-trial motion merely

states that the prosecution's closing argument contained "prejudicial, inflammatory, and erroneous statements designed to arouse the passions and prejudices of the jury" without setting forth the specific remarks complained of. This court has held that such a post-trial motion does not preserve the issues for review. (See *People v. Buford* (1982), 110 Ill. App. 3d 46, 54-55, 441 N.E.2d 1235; see also *People v. Turk* (1981), 101 Ill. App. 3d 522, 533, 428 N.E. 2d 510.) Additionally, no objections were made by defense counsel during the State's closing and rebuttal arguments. Although we may elect to review the asserted errors under the plain error rule (87 Ill. 2d R. 615(a)) after a finding that the evidence is closely balanced and that the error has prejudiced substantial rights of defendant (see *People v. Carlson* (1980), 79 Ill. 2d 564, 576, 404 N.E.2d 233), we decline to do so in the instant case. The evidence of defendant's guilt in this case can only be described as overwhelming, and those comments complained of which are not completely proper argument can not be said to have prejudiced defendant in such a way that there is a reasonable doubt that the verdict would have been the same had the remarks not been made.

With regard to our finding of a waiver, we take this opportunity to note the conflicts in authority concerning the proper method of preserving error for review. Although some opinions of our appellate court have stated that errors are not waived when they are objected to at trial or noted in the post-trial motion (see *People v. Clark* (1982), 108 Ill. App. 3d 1071, 1077, 440 N.E.2d 387; *People v. Fleming* (1964), 54 Ill. App. 2d 457, 460, 203 N.E.2d 716), the decisions of our supreme court indicate that alleged errors must both be objected to at trial and noted in the post-trial motion in order to be preserved for review. (See *People v. Precup* (1978), 73 Ill. 2d 7, 16, 382 N.E.2d 227; *People v. King* (1963), 29 Ill. 2d 150, 155, 193 N.E.2d 790.) In *People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856, the court explained the purpose of the requirement that errors be set forth in the post-trial motion in order to bring them to the attention of the trial court:

> " 'Requiring defendant's written motion for a new trial to specify errors allegedly entitling him to a new trial may save the delay and expense inherent in an appeal in those instances where the motion is meritorious. Additionally, it focuses the attention of the trial judge upon those aspects of the proceedings of which the defendant complains, and gives to the reviewing court the benefit of the judgment and observations of the trial court with reference thereto.' " 54 Ill. 2d 280, 284, quoting *People v. Irwin* (1965), 32 Ill. 2d 441, 443-44, 207 N.E.2d 76.

We regard the failure to include alleged errors in the post-trial motion as a waiver of those issues even where objections were made at trial. (See *People v. Stamps* (1982), 108 Ill. App. 3d 280, 293, 438 N.E.2d 1282.) We note that although objections at trial also serve to bring alleged errors to the attention of the trial judge, the hearing on the post-trial motion is the only point in the trial at which the trial judge has the opportunity to realistically assess the cumulative impact of errors which may have occurred during the trial, and therefore the failure to bring errors to the attention of the trial court in this manner deprives the trial court of the ability to make an informed ruling on the motion.

■ Additionally, the remarks complained of in the instant case do not constitute plain error. Defendant contends that reversible error resulted from the prosecutor's argument that Terry Coulter's trial testimony was consistent with his testimony before the grand jury, stating that there was no evidence in the record of Coulter's grand jury testimony and thus the credibility of the witness was impermissibly bolstered. The record shows, however, that defense counsel made several attempts to impeach Coulter with that testimony, and several times the State's objection that the material so employed was not impeaching was sustained. Defendant, having demonstrated the consistency of Coulter's testimony to the jury in this manner, can not be heard to complain of the State's argument based on that testimony.

Defendant next contends that the State's remark that defense counsel had signed into county jail as Evans' and Jennings' attorney in order to interview them amounted to an accusation that defense counsel had acted dishonestly in obtaining that testimony. That remark was clearly a reference to a fact not in evidence. The remark, however, came during the segment of the State's argument concerning the credibility of those two witnesses, and no particular emphasis was placed on the possibility that defense counsel had made a misrepresentation in order to gain access to the witnesses. The main thrust of that portion of the argument was the fact that neither witness had informed anyone of Coulter's alleged admission that he was perjuring himself until the witnesses were interviewed by defense counsel two days before they testified in this case. The remark is inconsequential when taken in the context of the whole argument, and we find that no prejudice accrued to defendant as a result of it.

■ ■ The remainder of the remarks complained of are statements which defendant contends were designed to disparage defense counsel. In the State's rebuttal and closing arguments, the prosecutors stated that defense counsel was trying to confuse the jury, that it

was defense counsel's job to "twist words," and that the defense closing argument was "preposterous, outrageous, and convoluted." The State also remarked that Evans and Jennings "rehearsed" their testimony when they were interviewed by defense counsel. Defendant also contends that the defense closing argument was interrupted continually by baseless objections after the State had been admonished to refrain from such objections.

It is well settled that comments implying that defense counsel is attempting to win an acquittal through trickery or misrepresentation are improper. (See, *e.g., People v. Witted* (1979), 79 Ill. App. 3d 156, 167-68, 398 N.E.2d 68.) However, the remarks complained of in the instant case do not, as defendant contends, amount to a charge that defense counsel was suborning perjury or fabricating the defense. Although the State argued that counsel "rehearsed" their testimony with Jennings and Evans, the jury was properly instructed that a lawyer has the right to interview all witnesses. The thrust of the argument was that defense counsel was attempting to obscure the evidence. Such an argument does not constitute reversible error. See *People v. Smylie* (1981), 103 Ill. App. 3d 679, 686, 431 N.E.2d 1130; *People v. Lavoy* (1980), 91 Ill. App. 3d 639, 644, 415 N.E.2d 487.

Defendant's contention that the defense closing argument was repeatedly interrupted by baseless objections after the State had been admonished to refrain from making such objections is meritless. The objections complained of are in the main well taken objections to references by defense counsel to facts not in evidence, to which the court responded that counsel would be allowed to argue and the jury would remember the testimony.

For the reasons expressed herein, the judgment of the circuit court is affirmed.

Affirmed.

PERLIN and HARTMAN, JJ., concur.