THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIAM STEFFENS, Defendant-Appellant.

First District (5th Division)   No. 83—1702

Opinion filed February 15, 1985.—Rehearing denied March 19, 1985.

142

James J. Doherty, Public Defender, of Chicago (Patricia J. Handlin, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Karen C. Wirth, and Mary Louise Norwell, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SULLIVAN delivered the opinion of the court:

Following a jury trial, defendant, William Steffens, was convicted of murder and given a 30-year sentence. On appeal, he contends that (1) the trial court erred (a) when it allowed the State to introduce a portion of defendant's post-arrest statement to the police but refused to allow him to introduce the rest of the statement, and (b) by allowing the State to present opinion testimony without a foundation or qualification of the witness; (2) he was not proved guilty beyond a reasonable doubt; (3) the prosecution's closing argument was erroneous, inflammatory, and highly prejudicial; and (4) his sentence was excessive.

It appears from the record that the victim—Edward Osika—and defendant had a verbal altercation regarding the speed of defendant's car on Mason Avenue outside the victim's parents' home, and after their initial encounter, defendant drove away and the victim entered

his parents' home with his wife and children.

Later, Thomas Osika—the victim's brother—shouted that defendant's car had returned, and several members of the Osika family ran from the house to the street. Thomas and Edward approached defendant's car, and although the accounts of the intervening events varied, it is uncontroverted that as defendant attempted to leave, his car made contact with Edward, who was caught underneath it, and dragged for over a block before the car stopped. The victim was taken to a hospital, where he died.

Thomas Osika testified that after he saw defendant's car parked alongside and slightly ahead of his brother's truck, he ran out of the house and into the street, followed by Edward. He saw someone standing on the running board looking into Edward's truck and, when he yelled, the man jumped off the running board and got into defendant's car. Thomas was then standing in the street in front of and close to Edward's truck. After the passenger reentered defendant's car, Thomas saw Edward in the street. "He was slipping" at that time and was about four feet from the curb and about 20 feet to the right of Thomas. The car sped off "a couple of seconds" after the passenger reentered. Thomas chased the car for almost 1½ blocks, yelling that his brother was underneath. His sister Sandy was following him, and when the car stopped the passenger jumped out and ran away. When Thomas told defendant that his brother was still underneath the car, defendant replied, "Well, good. I will be back for you later." He then left the scene after taking something from the car. On cross-examination, Thomas said that the street in front of his parents' house was a one-way street running south and there was a space of about 50 feet between his brother's truck and the next vehicle in front of it. Both the driver and the passenger were looking at Thomas when the passenger jumped into the car, and the car sped off a couple of seconds after he entered. Thomas also stated that Edward fell a couple of seconds before the driver of the car "hit the gas." When Edward was struck by the car, he was about 20 feet from him (Thomas). Although Edward was protected from southbound traffic by his own truck, defendant's car swerved in toward him when it accelerated forward.

Sandy Osika—the victim's sister—corroborated Thomas's testimony as to the first exchange between defendant and Edward, and she also testified that later, when they were all in their home, she heard Thomas yell, "Hey, they are back." Her father and brothers, with her following, ran out to the street. She saw defendant's car stopped with about half of the car in front of Edward's truck, and

saw the brown car start to pull away while Edward was standing in the street. The car struck and ran over him and then continued, with Edward caught underneath. She chased the car down the street, preceded by her brother Thomas. The car passed a stop sign at Gunnison without slowing, and when it did stop the passenger ran away. When Thomas yellowed to the driver, "You killed my brother," the driver reached his finger over the top of the car and said, "Okay, I am coming back for you later." He then ran from the scene. She denied telling detectives at the hospital that she did not actually hear what defendant said to Thomas. She stated that she saw the car strike Edward, and she denied telling the detectives that after she saw Edward walk around the front of his vehicle, the very next thing she saw was the car speeding down the street with Edward underneath it.

Defendant, after testifying to the first exchange of words with Edward on Mason Avenue on the day in question, stated that he dropped off a young woman who was in the car and then returned to Mason Avenue with the other passenger, Alan Kellerman. When he turned down Mason on this occasion, he was traveling 25 to 30 miles per hour, and he saw Edward standing next to his truck with an object in his hands. He lost sight of Edward when he walked to the passenger side of the truck, but then saw Thomas Osika with a brick in his hand. He was traveling about 30 miles per hour as he approached Edward's truck, when a brick struck his car and he turned to see who had thrown it. At the same time, he "punched the accelerator." When he turned his head back while still traveling at about 30 miles per hour, he saw Edward for a split second in front of the car and saw an object from Edward's hand fly through the air. As he proceeded down the street, the car did not pick up speed. He shifted to low gear but attained a speed of only 10 to 15 miles per hour, and the motor eventually died. He had no idea that he was dragging Edward down the street, although he did see three people chasing him as he drove. When he stopped the car, Thomas told him that he killed his brother, and after he replied that he had not killed anybody, Thomas told him that his brother was underneath the car, and he saw a leg protruding from under the car. He then took some items from the car and ran from the scene, telling Thomas to stay away from him. There were no dents on his car prior to this incident, and a dent on the passenger-side quarter panel of the car had not been there before the incident.

On cross-examination, defendant said that when he turned into Mason the second time, he saw Edward about one-half block away standing in the street, and he kept going at a speed of 25 to 30 miles per hour. Edward left his vision, and he then saw Thomas standing on

the sidewalk, holding a brick. He was still traveling about 25 to 30 miles per hour when his car was hit by a brick, and he turned to the right to see who threw the brick. When he looked back, he saw Edward about 1½ to 2 feet in front of his car. He did not swerve or try to miss Edward because he was going too fast. He did not feel anything when he struck Edward, nor did he feel the car dragging him down the street. He did not remember whether he told two detectives that he stopped or slowed his car the second time he drove down Mason, but he admitted lying to the police about his age and name. After the incident, he changed his clothes and took the vehicle sticker off the car because he was scared.

Officer Rabbit testified that during a conversation at the hospital with Sandy, he believed she told him that Thomas went to talk to the passenger of the car while Edward walked around the front of the car, giving it a wide berth. He believed that he also understood her to say that the next thing she remembered or saw was the car speeding down the street with Edward trapped underneath it, and that she saw defendant say something to Thomas after defendant left his car but she did not hear what was said. During this conversation with Sandy at the hospital emergency room, a nurse gave her a tranquilizer.

Thomas, called as a witness by defendant, testified defendant's car did swerve a couple of feet toward Edward. Thomas was then recalled by the State in rebuttal, and he denied that anyone had or threw a brick or pipe that day. He also stated defendant's car stopped after a block and a half, and he again stated that defendant said, "I will be back for you later." Sandy, on recall, also said that no one had or threw anything that day and that she did see defendant's car start up and strike Edward and did hear defendant say to Thomas, "Okay, I will be back for you later."

OPINION

■ Defendant first contends that the trial court committed reversible error when it refused admission of the remainder of defendant's post-arrest statement to the police after the State had introduced a portion thereof for the purpose of impeachment. The State maintains that since no offer of proof was made by defendant, the alleged error was not properly preserved for appeal. (*Szymkowski v. Szymkowski* (1982), 104 Ill. App. 3d 630, 432 N.E.2d 1209.) The plain-error doctrine may be involved, however, where the question of guilt is close and the error in question may have substantially affected the outcome of the case (*People v. Sanders* (1983), 99 Ill. 2d 262, 457 N.E.2d 1241), and here, since the defendant's credibility is

crucial because the question of guilt rests entirely on his intent at the time of the incident and because the trial court was generally made aware of the evidence expected to be offered (see *People v. Martin* (1981), 101 Ill. App. 3d 480, 428 N.E.2d 591), we will consider defendant's contention.

Defendant testified that he drove past the Osika house the second time at a speed of about 30 miles an hour and that he did not stop or slow down before making contact with Edward, but Officer Rabbit—in rebuttal—testified that defendant told him at the time of his arrest that he did slow or stop his car as he passed the Osika house for the second time. Defendant then sought to introduce the rest of defendant's statement to Officer Rabbit, all of which had been recorded in his police report, but was not allowed to do so. The statement, as filed by defendant in the supplemental record, is as follows:

"Steffens stated that he had been the driver of the car and that he had hit Osika by accident. When asked for a detailed account of the incident Steffens stated that he had driven down Mason Avenue and had come upon Edward Osika with his open truck door blocking the street. Steffens states he cursed at Osika and finally got by. Steffens stated that he had then gone around the block and come back to 4870 Mason. He doesn't know why he came back around. Steffens stated that as he stopped or slowed the car all the Osika family came running out to the street, including an old man throwing a brick at them. Steffens states he just hit the gas to flee and had never even saw the man they ran over and never noticed that they were dragging the man down the street. Steffens then got scared of the people chasing the car and jumped out and ran. He and Alan Callarman [*sic*] met up down the street and went home to Berwyn. Steffens then got Tommy Callarman [*sic*] to call and report the car stolen. Next thing he knew the Berwyn Police had picked him up and brought him into Area 5.

At the time of the arrest and throughout the interviewing and statements Steffens stated he was 16 years old. After being printed he stated that he was really William Krolik, age 17. This information has yet to be substansiated [*sic*]."

In support of his contention that he should have been permitted to introduce the entire statement, defendant cites *People v. Kalpak* (1957), 10 Ill. 2d 411, 140 N.E.2d 726, as authority for the broad proposition that when a conversation is related by a witness, the opposing party has a right to bring out all of the conversation on cross-examination. The *Kalpak* court actually made a more qualified state-

ment. "If a witness testifies to part of a conversation on behalf of one party, the other is entitled to show all that was said in that conversation *on the same subject.*" (Emphasis added.) 10 Ill. 2d 411, 424, 140 N.E.2d 726, 733.

Moreover, it is well established that when a witness has been impeached with a prior inconsistent statement, he may offer in rehabilitation only prior consistent statements which qualify or explain the inconsistency. (*People v. Hicks* (1963), 28 Ill. 2d 457, 192 N.E.2d 891; *People v. Andersch* (1982), 107 Ill. App. 3d 810, 438 N.E.2d 482.) Here, we note, and defendant admits, that nothing in the remainder of the statement explains or concerns the inconsistency testified to by Officer Rabbit; rather, it appears that the rest of the statement corroborates other portions of his testimony.

■ Defendant also refers us to *United States v. Walker* (7th Cir. 1981), 652 F.2d 708, for further support, but we considered *Walker* in *Andersch*, and we believe that analysis under the principles involving the Federal evidentiary rules applicable in *Walker* would lead to the same result here. We additionally note that the authority presented by defendant during and after oral argument here do not require a different result. Those cases (*People v. Klinkhammer* (1982), 105 Ill. App. 3d 747, 434 N.E.2d 835; *People v. Richmond* (1980), 84 Ill. App. 3d 1017, 406 N.E.2d 135), which stand for the rule that a prior consistent statement may be presented to rebut charges of recent fabrication, are inapposite in the case before us, where the portion of the statement testified to by Officer Rabbit was inconsistent with defendant's testimony and there is no contention that it was of recent fabrication. We find that the trial court ruled correctly in denying admission of the remainder of defendant's statement to the police.

■ Defendant next contends that he was not proved guilty of murder beyond a reasonable doubt and, alternatively, that he was, at most, guilty of reckless homicide. It is the jury's function, however, to resolve factual disputes, assess witness credibility, and determine the weight and sufficiency of the evidence, and the jury's verdict will not be reversed unless the evidence is so unsatisfactory or improbable that a reasonable doubt as to the defendant's guilt remains. (*People v. Yates* (1983), 98 Ill. 2d 502, 456 N.E.2d 1369, *cert. denied* (1984), 466 U.S. 981, 80 L. Ed. 2d 836, 104 S. Ct. 2364.) Here, there is no dispute that the automobile driven by defendant hit and dragged the victim, and the only issue present in defendant's reasonable-doubt contention is his level of intent. The difference between the intent required for murder and that required for involuntary manslaugh-

ter[1] is the degree to which the acts performed by defendant risk death or great bodily harm. *People v. Mifflin* (1984), 120 Ill. App. 3d 1072, 458 N.E.2d 1343.

The murder statute provides:

"A person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death:

(1) He either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

(2) He knows that such acts create a *strong probability* of death or great bodily harm to that individual or another; ***."

(Emphasis added.) (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(a).)

Intent may be implied or inferred from the character of the act. (*People v. Davis* (1966), 35 Ill. 2d 55, 219 N.E.2d 468.) Thus, it is not necessary to directly prove that defendant had the intent to murder; all that need be shown is that he voluntarily and willfully committed an act, the natural tendency of which was to cause death or great bodily harm. (*People v. Szerletich* (1980), 86 Ill. App. 3d 1121, 408 N.E.2d 1098; *People v. Johnson* (1978), 66 Ill. App. 3d 84, 383 N.E.2d 648.) It is our task, then, to determine whether the evidence is sufficient to support the jury's finding concerning defendant's level of intent for murder, and that evidence must show, at the very least, that defendant knew that his acts created a strong probability of death or great bodily harm.

In our review of the evidence, we especially note that defendant admitted during his testimony that he saw Edward Osika in front of his car before he hit him, and there is no question that his death resulted either from the impact or from being dragged under the car for a block and a half or from a combination of the impact and dragging. Although defendant said that he was, at most, two feet from the victim when he saw him and could not stop in time to avoid hitting him, Thomas testified that his brother was 20 feet in front of defendant's vehicle at the time defendant started his car and only about four feet from the curb. So positioned, he would not have been struck by defendant's car if it went straight forward. Thomas, however, testified that defendant swerved the car toward Edward before striking him. It is generally necessary to prove intent through use of circumstantial evidence (*People v. Jones* (1977), 55 Ill. App. 3d 446, 370 N.E.2d 1142), and a defend-

---

[1]Since the victim was killed as a result of defendant's conduct with a motor vehicle, reckless homicide is involved rather than involuntary manslaughter, but the element of intent is the same. See Ill. Rev. Stat. 1981, ch. 38, par. 9—3.

ant's intent may be inferred from the surrounding facts and circumstances, including his words and actions (*People v. Jones* (1981), 93 Ill. App. 3d 475, 417 N.E.2d 647). It appears to us that from the testimony of Thomas—that defendant's car swerved toward and struck Edward—the jury could reasonably have believed that defendant intended to hit the victim with his vehicle. Supportive of this belief is the additional testimony of Thomas that when he told defendant, after his car stopped, that Edward was still underneath the car, defendant replied, "Well, good. I will be back for you later."

Furthermore, although defendant testified that he did not see the victim until it was impossible to avoid hitting him, he also testified that he continued driving for almost a block until the car came to a stop. While defendant denied knowing that the victim was underneath his car, he did admit hitting him, and we think the jury could also have reasonably believed that defendant knew he was dragging the victim. This view is supported by his own testimony that he had been traveling 25 to 30 miles per hour and after the impact he tried but could not attain a speed of more than 10 to 15 miles per hour, even though he shifted gears to increase his speed. In light thereof and because his car eventually stalled due to the drag of the victim's body after being driven for 1 to 1½ blocks, it appears to us that it was not unreasonable for the jury to believe that defendant knew his actions created a "strong probability of death or great bodily harm." Considering the totality of the circumstances, we find that defendant was proved guilty beyond a reasonable doubt.

Defendant next contends that the trial court erred in allowing Officer Sanders, an employee of the crime laboratory—over objection—to express a lay opinion on the age of the dents on the car. The State correctly argues that defendant has waived his right to raise this issue on appeal by failing to include it in his post-trial motion. (*People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856.) Moreover, admission of the testimony was not error since a lay witness may express "an opinion based upon his observations where it is difficult to reproduce for the jury the totality of the conditions perceived and where the opinion given is one that persons in general are capable of making and understanding." (*People v. Stokes* (1981), 95 Ill. App. 3d 62, 66, 419 N.E.2d 1181, 1185.) In *Stokes*, a police officer expressed an opinion concerning the trajectory of a bullet and the point of origin of gunfire. We believe that here, the testimony that the indentations "appeared to have been there for some time" because they seemed to be "weather worn" was even more clearly within the range of opinions which persons in general could make based on their observations, and we therefore find that

the testimony was properly admitted.

■ Defendant next contends that a number of comments by the prosecutor in closing argument were improper and highly prejudicial. We initially note that, although some of the comments were objected to, the issue as to the propriety of all of them was not preserved for review because defendant failed to specifically set them forth in his post-trial motion. (See *People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856; *People v. Thomas* (1983), 116 Ill. App. 3d 216, 452 N.E.2d 77.) In any event, we do not believe, as will be discussed below, that the comments resulted in such prejudice to defendant as to constitute reversible error. See *People v. Pittman* (1982), 93 Ill. 2d 169, 442 N.E.2d 836.

In this regard, we first consider defendant's contention that the prosecutor improperly referred to answers of jurors on *voir dire*. In his closing argument, defense counsel commented that the occurrence in question was an accident, and he suggested that this position was supported by a statement of Thomas Osika, who in his testimony referred to the police arriving "at the scene of the accident." In rebuttal, the prosecutor remarked that many people refer to a collision of automobiles or the impact between a car with a person or thing as accidents, and that Thomas Osika's statement should be considered as only such a casual reference, unrelated to the question of defendant's intent. To support this view, the prosecutor included in his remarks a reference to the questioning on *voir dire* during which three jurors revealed that each termed an occurrence in which a friend was killed or injured as an accident. We believe that the remarks complained of were a proper response to the earlier comment by defense counsel, and even if they were not, we do not feel—as defendant argues—that they were prejudicial. See *People v. Mitchell* (1979), 78 Ill. App. 3d 458, 397 N.E.2d 156.

■ Defendant next maintains that he was prejudiced when, in closing argument, the prosecutor repeatedly and improperly called him a liar. We disagree. A defendant may properly be called a liar, however, if the statement finds support in the evidence. (*People v. Tiller* (1982), 94 Ill. 2d 303, 447 N.E.2d 174, *cert. denied* (1983), 461 U.S. 944, 77 L. Ed. 2d 1302, 103 S. Ct. 2121.) Here, defendant was not only impeached by prior inconsistent statements to the police, but he also admitted that he gave a wrong name, age, and address to the police, and that he told the owner of the car to report it as being stolen. While we believe that he could properly be termed a liar from those facts, we note also that his counsel referred to him as a liar in closing argument, stating, "There is no question that he [defendant] was lying. *** He lied after the accident. *** And later, he panicks

[*sic*] and lies."

■ Defendant also argues that he was prejudiced when the prosecutor misled the jury in closing argument by giving incomplete definitions of reckless homicide and murder and inferring that the mental state in each was the same. It is proper, however, for an attorney to give examples illustrating the application of the law to the facts (*People v. Boyd* (1980), 88 Ill. App. 3d 825, 410 N.E.2d 931, *cert. denied* (1981), 454 U.S. 1080, 70 L. Ed. 2d 613, 102 S. Ct. 633), and where the attorney correctly states the law, there can be no prejudice to the opposing party (*People v. Schreiber* (1982), 104 Ill. App. 3d 618, 432 N.E.2d 1316, *cert. denied* (1983), 459 U.S. 1214, 75 L. Ed. 2d 452, 103 S. Ct. 1214). Here, we have examined the comments complained of, which for the most part are examples illustrating the application of the law to the facts, and we find that the definitions of reckless homicide and murder, while not artfully stated, were not incorrect. We further find no basis for the argument that the prosecutor improperly inferred that the mental states in both offenses were the same. In view thereof and because the jury was properly instructed by the trial court as to the level of intent in both offenses, we reject defendant's argument that he was prejudiced by the comments.

■ Defendant finally contends that his 30-year sentence was excessive. A sentence of not less than 20 years and not more than 40 years may be imposed for murder (Ill. Rev. Stat. 1981, ch. 38, par. 1005-8-1(a)(1)(a)); however, pursuant to Supreme Court Rule 615(b)(4), we have the discretionary power to reduce an excessive sentence (88 Ill. 2d R. 615), but a trial court's sentencing decision will not be disturbed absent an abuse of discretion (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882). An abuse of discretion may be found even where the sentence is within the statutory limitations, however, if that sentence is greatly at variance with the purpose and spirit of the law. (See *People v. Gibbs* (1977), 49 Ill. App. 3d 644, 364 N.E.2d 491.) The Illinois Constitution requires that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship" (Ill. Const. 1970, art. I, sec. 11), and defendant here argues that the trial court abused its discretion by not taking into consideration his age and rehabilitative potential.

In *Gibbs*, we stated that the constitutional mandate requires that the trial court actually consider rehabilitation as an objective of the sentence. The legislature has determined that adequate retribution for murder may be satisfied by imposition of the minimum sentence (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—1(a)(1)(a)), and, in *Gibbs*, we de-

scribed the further analysis necessary under the constitutional sentencing provision as follows:

"Each case, of course, must be considered separately for its own particular illumination of, and response to, the meaning of the [constitutional] mandate. The nature and circumstances of the offense and the history and character of the defendant will be the governing factors." *People v. Gibbs* (1977), 49 Ill. App. 3d 644, 649, 364 N.E. 2d 491, 494.

With respect to the nature and circumstances of the particular offense, we note that in *Gibbs* defendant walked up to the door of the victim's apartment and, when the victim answered defendant's knock, defendant shot and killed him. The trial court imposed a sentence of 50 to 100 years, and we reduced it to 15 to 45 years since Gibbs was only 19 years old, was steadily employed, had no previous criminal record, and lived with his parents. In the present case, the offense was not a calculated murder. The confrontation between defendant and the victim was initiated by the victim, and, even though defendant returned to the scene apparently to cause some sort of trouble, the murder itself was the result of a sudden escalation of the encounter between defendant and the victim's family. We particularly note the short period of time which elapsed, and, taken in context, the offense did not approach the type of premeditated attack at issue in *Gibbs*, where we reduced the sentence.

With respect to the issue of rehabilitation, we note that we have reduced a defendant's sentence on the basis of rehabilitative potential where a defendant came from a poor social environment and had limited education (see *People v. Kosanovich* (1979), 69 Ill. App. 3d 748, 387 N.E.2d 1061), where defendant has expressed a desire to continue his education (see *People v. Nelson* (1982), 106 Ill. App. 3d 838, 436 N.E.2d 655), and in certain cases, where defendants were extremely young (see *People v. Rickard* (1981), 99 Ill. App. 3d 914, 425 N.E.2d 1317; *People v. Smith* (1977), 50 Ill. App. 3d 320, 365 N.E.2d 558, *cert. denied* (1978), 435 U.S. 1008, 56 L. Ed. 2d 390, 98 S. Ct. 1880; *People v. Horton* (1976), 43 Ill. App. 3d 150, 356 N.E.2d 1044). Here, defendant was only four weeks past the age of 16 at the time of the incident, and his only criminal record was conviction for burglary as a juvenile three years prior. While serving a year at the Peoria Youth Farm for that offense, he completed a year of high school, and we note that although the trial court said defendant had a "vicious streak within him," the record indicates that he had never been arrested for a violent crime even though he comes from a very poor social background. We also note that the probation officer who prepared the pre-

sentence investigation report indicated that defendant was very cooperative and expressed a desire to continue his education while incarcerated.

In the light of the circumstances presented, the defendant's age, and lack of a significant criminal record, we believe that defendant's rehabilitative potential was not given adequate consideration. Accordingly, under the authority of Supreme Court Rule 615(b)(4), we reduce defendant's sentence for murder to 20 years.

Judgment affirmed as modified.

MEJDA, P.J., and LORENZ, J., concur.