THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MANUEL RIOS, Defendant-Appellant.

First District (2nd Division) No. 85—475

Opinion filed June 17, 1986.

Nicholas A. DeJohn, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry, James E. Fitzgerald, and Theresa M. Gray, Assistant State's Attorneys, of counsel), for the People.

JUSTICE STAMOS delivered the opinion of the court:

Defendant appeals from his conviction for murder.

The defendant was charged with the attempted murder of Andres Garcia and the murder of Guatemoc Aguilar. On the charge of attempted murder defendant was acquitted, but he was convicted of mur-

der and sentenced to prison for 34 years.

The charges against defendant arose from a night of gang violence on the near southwest side of Chicago. At about 11:30 p.m. on February 3, 1984, the murder victim, Guatemoc Aguilar, and his companion, Flavio Sanchez, were walking on 18th Street toward Sanchez' home when they noticed a white Grand Prix drive past them. According to Sanchez, the defendant was driving this car, and another man, whom Sanchez recognized as Nelson Torres, was a passenger. There were also several other passengers in the car, but Sanchez could not identify them. As the car went by, defendant and Torres flashed gang symbols at Sanchez and the murder victim. The victim and Sanchez were members of the Ambrose street gang, and the defendant and his companion were members of a rival gang the Latin Counts. The signals flashed by the defendant meant "Latin Counts Love, Ambrose Killers." According to Sanchez, he and the defendant were well acquainted with one another since they had engaged in numerous fights over the years, and defendant had shot at Sanchez on several occasions.

After having seen the defendant drive past them, the murder victim and Sanchez went to Sanchez' apartment. The two men stayed at Sanchez' until midnight. Then they waited for a bus on 18th Street outside of Sanchez' apartment building. Once again, the defendant and his companions drove down the street in a white Grand Prix and flashed the ominous gang symbols. The victim and Sanchez walked back toward Sanchez' apartment where they were joined by two of their gang comrades. According to Sanchez, the defendant cruised past the group one more time.

As the murder victim and his friends stood in front of Sanchez' apartment building, two police officers and a reporter who was researching gang problems approached the group. Just as the officers and reporter arrived, Sanchez observed defendant at the edge of an alley across the street. Defendant, wearing a black leather jacket, was accompanied by another man, and Sanchez said that the defendant looked as if he held a long pipe in his right hand. Defendant raised a rifle and shot in Sanchez' direction. The bullet flew past Sanchez, and he dove to the ground. A second shot struck the murder victim in the face, and he died from this wound.

Sanchez was distraught by the murder of his friend. Shortly after the shooting he told the police that he did not see who killed Aguilar. Sanchez explained later that he did not tell the police that the defendant was the killer because he had developed his own plan for vengeance against the Latin Counts. About 12 hours after the shooting, however, Sanchez went to the police and told them that the defendant had killed

Guatemoc Aguilar.

Another witness observed the shooting of Guatemoc Aguilar. Jessie Aguilar, the victim's cousin, was looking out of the window from his second-floor apartment at the time of the murder. He could see the victim standing with a group of friends on the street below. Jessie also saw the defendant, whom he knew as "Me Me," standing with an object that looked like a long pipe pointed at the murder victim. Jessie turned from the window momentarily, and he heard two gunshots. He turned back to look out the window, and he saw the victim lying on the ground. He also saw defendant put the gun down and escape through the alley.

Like Sanchez, Jessie did not immediately implicate the defendant in the murder. In fact, he told the police and a reporter that he did not see who had killed his cousin, Guatemoc. Later, however, he identified defendant's picture from among five mug shots. Jessie explained at trial that he and Sanchez were planning to avenge Guatemoc's death themselves, so they decided not to tell the police about defendant's part in the murder.

Andres Garcia, a cousin of both the murder victim and Jessie Aguilar, was with Jessie in the apartment on the night of the murder. Garcia heard Jessie shout that the defendant, Manuel Rios, or "Me Me," was in the alley with a gun. After Garcia heard the gunfire he ran to see what had happened to his cousin. When the murder victim was taken to the hospital, Garcia returned to Jessie's apartment. About one-half hour later, Garcia went out for cigarettes. He saw a white Grand Prix driving toward him. Then he noticed that the defendant, wearing a black leather jacket, was in the car. Defendant shot at Garcia and sped away. The next day, Garcia identified defendant as the person who had shot at him.

Maria Sanchez, Flavio's sister, was at home on the night of the killing. Her mother reported to her that a white Grand Prix had been cruising the area. Then Maria observed someone in a white car shoot at Andres Garcia.

At his trial, defendant testified about the events of the evening of February 3, 1983, and he offered evidence to rebut the prosecution's case. At about 11 p.m., defendant was stopped by two police officers and the reporter who was researching gang activity. When the officers stopped defendant, he was in an orange Mustang or Nova, not a white Grand Prix. The defendant testified that he was attending a party at the time of the shooting. He presented four alibi witnesses to corroborate his testimony. Three of the alibi witnesses said that they recalled that defendant was at the party at 12:15, the time of the shooting, because that was when the police interrupted the gathering with a com-

plaint about noise. The State discredited the testimony of the alibi witnesses with a police dispatch record which showed that an officer had made a call to the party at 1 a.m.

At the close of all the evidence, defendant was convicted of the murder of Guatemoc Aguilar, and he now appeals.

Defendant's first objection is that the State did not prove him guilty beyond a reasonable doubt. This argument is unpersuasive.

A jury's determination that a defendant has been proved guilty beyond a reasonable doubt will not be set aside lightly. When the evidence in a case is irreconcilably conflicting, as it was here, it is the peculiar prerogative of the jury to ascertain the truth. A reviewing court may not substitute its judgment for that of the trier's of fact on issues involving the weight of the evidence or the credibility of the witnesses. An appellate court will not reverse a criminal conviction unless the evidence is so unsatisfactory or improbable as to raise a reasonable doubt about defendant's guilt. *People v. Manion* (1977), 67 Ill. 2d 564, 578, 367 N.E.2d 1313.

The evidence in the present case is not so improbable as to require a reversal of defendant's conviction. Two eyewitnesses identified the defendant as the person who had shot the murder victim. It is true that these witnesses made prior inconsistent statements. Witness Sanchez told police that he did not know who had shot the victim, but Sanchez explained at trial that he did not immediately implicate defendant because he wanted to punish the killer himself. Witness Aguilar told the police that he could not identify the murderer, and he told a reporter the same thing. At trial, Aguilar said that he and Sanchez had devised their own plan for revenge just minutes after the shooting, and as a consequence, they decided not to share their information with the police. The fact that these witnesses delayed in implicating the defendant affects the weight accorded their testimony. The jury is charged with evaluating the weight of the testimony, however, and their judgment in this regard should not be disturbed by a court of review. *People v. Orr* (1977), 45 Ill. App. 3d 660, 665, 359 N.E.2d 1237.

Neither does the defendant's alibi testimony inject an element of reasonable doubt into this case. Although four witnesses testified that the defendant was at a party at the time of the murder, the State discredited this testimony by showing that the police had not made a call to the party at 12:15 as some of the witnesses contended. Moreover, when the identity of the accused is an issue, the testimony of one witness is sufficient to convict even though such testimony is contradicted by the accused, provided that the witness is credible and was able to view the accused under such circumstances as would permit a

positive identification. (*People v. Manion* (1977), 67 Ill. 2d 564, 578, 367 N.E.2d 1313.) In the present case, Sanchez and Aguilar were well acquainted with the defendant and viewed him under circumstances that permitted a positive identification. The testimony of these witnesses was not inherently lacking in credibility and was therefore sufficient to convict the defendant.

▋▋ Defendant's second objection is that the State withheld evidence requested by defense counsel in a discovery motion. In his motion, defense counsel requested the written or recorded statements of any witnesses, and he asked for any evidence in the State's possession or control which would negate defendant's guilt. In response to defense counsel's request, the State produced, among other things, the name of the reporter who had accompanied police officers to the scene of the murder. The reporter talked to some witnesses immediately after the shooting, and she made an audio recording of the events that transpired at the scene of the shooting and at the hospital where the victim was taken for treatment. The State and the defendant agree that one of the voices on the tape was that of eyewitness Jessie Aguilar. On the audio recording, Jessie made statements inconsistent with his trial testimony. He said that he did not know who had shot his cousin, although he had observed that the assailant wore a sweater. Jessie also said that he had not seen a weapon. Another voice on the tape was unidentifiable, although defendant claims that it was Flavio Sanchez since the unidentified person said that he "felt the wind" after the killer had fired the first shot.

Apparently, the State was aware of the existence and content of the tape several months prior to the defendant's trial, but the prosecutors never revealed this information to the defendant. The defense counsel knew that the reporter had talked to some of the witnesses since he asked the witnesses about these interviews when they testified at trial. However, the defense counsel did not have an opportunity to listen to the tape until the third day of trial after he had already questioned Flavio Sanchez and Jessie Aguilar. The court refused to admit the tape as evidence, presumably because the defendant had not laid a proper foundation.

Defendant now contends that he was denied due process because the State withheld information about the tape recording. He also argues that the State breached Supreme Court Rule 412(a)(i), which requires the prosecution to produce the written or recorded statements of witnesses when the defendant requests them. 87 Ill. 2d R. 412(a)(i).

The State breached its duty under Supreme Court Rule 412. Rule 412(a)(i) requires that the State shall, upon written request of defense

counsel, disclose to the defendant information within its possession or control, including relevant written or recorded statements of witnesses whom the prosecution intends to call at trial. (87 Ill. 2d R. 412(a)(i).) In the present case, the defendant made a specific written request for the recorded statements of witnesses, but the State failed to reveal any information about the tape recording made by a reporter at the scene of the murder.

The State argues that this recording was not in its possession or control. The tape itself was held by WMAQ and was apparently controlled by the station's counsel. Defendant's attorney observed during a side bar conference that he had subpoenaed the reporter several months prior to trial, but the station's attorney would not allow the reporter to talk about the case. In fact, the defense counsel said that he had asked WMAQ's lawyer for a copy of the tape, but the lawyer would not provide one.

It is true that under Supreme Court Rule 412, the State is not required to produce information which is outside of its possession or control. (*People v. Bolla* (1983), 114 Ill. App. 3d 442, 453, 448 N.E.2d 996.) In this case, however, the State had access to the tape and was aware of its existence and content well before trial. Although the tape itself was not in the State's possession or control, the prosecutor was obligated to reveal the content of this material to the defendant after defense counsel had made a specific request for it in a discovery motion.

Even though the State breached our supreme court rule, this conduct did not deprive defendant of a fair trial and does not demand reversal of his conviction. It is true that suppression of evidence favorable to the defendant after the information has been requested by him violates due process where the evidence is material to guilt or punishment. (*Brady v. Maryland* (1963), 373 U.S. 83, 87, 10 L. Ed. 2d 215, 218, 83 S. Ct. 1194, 1196-97; *People v. Burns* (1979), 75 Ill. 2d 282, 288, 388 N.E.2d 394.) For evidence to be material in the *Brady* context it is not enough simply that it would have helped the defense. (*People v. Velez* (1984), 123 Ill. App. 3d 210, 217, 462 N.E.2d 746.) Implicit in the requirement of materiality is the concern that the suppressed evidence might have affected the outcome of the defendant's trial. *United States v. Agurs* (1976), 427 U.S. 97, 104, 49 L. Ed. 2d 342, 350, 96 S. Ct. 2392, 2397-98.

In the present case, the State was obligated to inform the defendant of the existence and content of the tape recording because it was evidence favorable to him, and he made a specific request for it. It does not matter that the defendant knew of the existence of the tape prior to trial. (See *People v. Dixon* (1974), 19 Ill. App. 3d 683, 687, 312 N.E.2d

390.) Nor is the prosecutor's conduct excusable because the defendant finally heard the tape during the trial. Since the defendant did not know the content of the tape prior to trial, his ability to plan an effective defense strategy was impaired. (See *People v. Elston* (1977), 46 Ill. App. 3d 103, 106-07, 360 N.E.2d 518.) Moreover, the late disclosure of *Brady* material in the midst of trial may still give rise, in some cases, to a violation of due process. *People v. Bivins* (1981), 97 Ill. App. 3d 386, 391, 422 N.E.2d 1044.

Despite these considerations, the defendant was not deprived of due process in this case because the tape recording was not material evidence. Even without the tape, it was established at trial that Jessie Aguilar had told the reporter and a police officer that he did not see who killed the murder victim. Most of Aguilar's recorded statements were cumulative evidence unlikely to have an effect on the outcome of the case. It is true that on the tape, Aguilar also said that he had not seen a weapon and that the killer was clad in a sweater, while at trial, Aguilar stated that he had seen a rifle and that the defendant was wearing a black leather jacket. These inconsistencies would not have called for an acquittal, however, given the substantial evidence of the defendant's guilt.

No other voice on the tape recording was identifiable. Furthermore, even if the other voice on the tape was Flavio Sanchez as the defendant contends, the inconsistent statements made by Sanchez had already been presented to the jury during the course of the trial. It is doubtful, therefore, that introduction of the tape would have changed the verdict in this case.

Defendant's third objection is that the court erred in refusing to admit the tape as evidence. The State argued at trial and contends on appeal that this evidence was inadmissible to impeach Sanchez and Aguilar because defendant had not laid a proper foundation and could offer no proof that one of the voices on the tape was that of Flavio Sanchez. Defendant argues that he was denied an opportunity to lay a proper foundation with Aguilar and Sanchez because he had not yet heard the tape when these two witnesses were on the stand.

■ Contrary to the State's assertion, defendant laid a proper foundation for the admission of Jessie Aguilar's recorded statement that he did not see who had killed his cousin. A proper foundation is laid by directing the attention of the witness to the time, place, circumstances, and substance of his inconsistent statement. (*People v. Bradford* (1985), 106 Ill. 2d 492, 500-01, 478 N.E.2d 1341.) Defense counsel asked Jessie whether he had told a reporter that he did not see the killer, and Jessie admitted that he had made such a statement. Even when a witness

admits having made a statement, as Jessie did here, the statement may still be introduced as evidence. 106 Ill. 2d 492, 500, 478 N.E.2d 1341.

■ Although Jessie's statement was admissible, the trial court did not commit reversible error by excluding a tape recording of Jessie's comment. This is so because the tape was cumulative evidence, which a judge may exclude at his discretion. See *People v. Dallas* (1980), 85 Ill. App. 3d 153, 174, 405 N.E.2d 1202.

Our supreme court has ruled that a tape recording must be admitted, under some circumstances, even when the content of the tape has been set forth through the testimony of witnesses. In *People v. Williams* (1985), 109 Ill. 2d 327, 487 N.E.2d 613, the court held that it was reversible error to exclude a tape recording of statements that the defendant had made to the police shortly after his arrest. The police officers in *Williams* testified about the content of these tape-recorded interviews, and the defendant cross-examined the officers using a transcript of the tape. Despite the fact that the defendant's statements were fully aired before the jury, the *Williams* court determined that the defendant should have been allowed to play the tape.

According to the *Williams* court, an evidentiary "rule of completeness" demands that if one party introduces part of a conversation into evidence, the opposing party may introduce the remainder of the conversation so that the entire exchange is placed in proper perspective for the trier of fact. (109 Ill. 2d 327, 334, 487 N.E.2d 613.) Since the State in *Williams* had introduced part of the defendant's interviews into evidence, the rule of completeness required that the defendant be allowed to fully explore the remainder of these conversations. The right to bring out all of a conversation is not absolute, however, but depends upon the relevancy of additional parts of the conversation. In the judgment of the *Williams* court, where a tape recording has relevance independent of the words spoken, a party should be allowed to play it for the jury even when the content of the tape has been set forth through the testimony of witnesses. 109 Ill. 2d 327, 334-35, 487 N.E.2d 613.

In *Williams*, the tape of defendant's conversation had such independent relevance. The defendant claimed at trial that he had been frightened and overwrought when he made certain inculpatory statements to the police. He also contended that in a moment of panic, he was coerced by his accomplice to take some items of personal property from the murder victim's apartment. The State, on the other hand, argued that Williams had coolly calculated a robbery from the outset of his encounter with the murder victim. In view of this conflict, the *Williams* court concluded that the emotional tenor of the defendant's voice as it was captured on tape assumed a significance independent of the

actual words spoken. Under these circumstances, the jurors should have been permitted to hear the defendant's inflection and tone so that they could properly assess the veracity of his statements to the police. 109 Ill. 2d 327, 337, 487 N.E.2d 613.

The present case is distinguishable from *Williams*. In *Williams*, the State had introduced into evidence defendant's tape-recorded statements, and a rule of completeness demanded that defendant be able to play a tape of these statements for the jury. Here, it was the defendant, not the State, who initiated a line of questions on Jessie Aguilar's tape-recorded statements. The rule of completeness is inapplicable under such circumstances, where the party seeking to play a tape-recorded conversation has himself introduced the conversation into evidence. Fairness did not demand that defendant in the present case be allowed to bolster his defense by playing a tape of Jessie Aguilar's prior inconsistent statement.

Furthermore, the tape in this case did not have independent relevance as the tape did in *Williams*. In *Williams*, the defendant's tone of voice was material to his defense; if he sounded emotionally overwrought on tape, this would explain why he had made some inculpatory statements to the police. In the present case, the tone of Jessie Aguilar's voice as he spoke on tape had no relevance independent of the fact that he made a statement inconsistent with his trial testimony. While it is true that tone of voice is generally somewhat indicative of the speaker's sincerity, verbal demeanor was not itself an issue here as it was in *Williams*. In view of this fact, we do not believe that *Williams* controls our decision in the present case.

Although it was within the trial judge's discretion to exclude a tape of Jessie saying that he could not identify the killer, the judge should have admitted that portion of the tape on which Jessie said that he had not seen a weapon and that the killer had worn a sweater. These statements were not merely cumulative since Jessie did not testify about them at trial. It is true that no foundation had been laid to support the admission of these comments. However, defendant claims on appeal that he was denied an opportunity to lay a proper foundation because he did not hear the tape until after Jessie had been called as a witness.

A court may abuse its discretion when it refuses to allow defendant to recall a witness to perfect a foundation. This is so because the concept of justice demands that the defendant be given every opportunity to present testimony to the jury that may cast doubt upon the veracity of a State's witness. (*People v. Cobb* (1983), 97 Ill. 2d 465, 480-81, 455 N.E.2d 31.) In the present case, defendant never asked the trial judge to recall Jessie as a witness, so he has waived this objection for the

purpose of appeal. See *People v. Thomas* (1983), 116 Ill. App. 3d 216, 220, 452 N.E.2d 77.

■■ Even if the court erred in refusing to admit a tape of Jessie Aguilar's prior inconsistent statements, however, this error would not demand reversal. Where there is sufficient competent evidence establishing defendant's guilt beyond a reasonable doubt, and it does not appear that the error complained of was the basis for the jury's verdict, then an error is harmless. (*People v. Chianakas* (1983), 114 Ill. App. 3d 496, 505, 448 N.E.2d 620.) Evidence of defendant's guilt in this case was ample, and the State was able to explain Jessie Aguilar's inconsistent statements to the apparent satisfaction of the jury. The introduction of additional but similar inconsistencies would not have affected the outcome of the case, nor would a different verdict be called for if the jury had heard Jessie say on tape that he did not see who killed his cousin.

■■ Finally, the court did not err in refusing to admit what defendant alleged was a tape recording of Flavio Sanchez' voice. Sound recordings which are otherwise competent and material are admissible if a proper foundation is laid to assure the reliability and authenticity of the recording, including the identification of voices. (*People v. Estrada* (1980), 91 Ill. App. 3d 228, 237-38, 414 N.E.2d 512; *People v. McCommon* (1979), 79 Ill. App. 3d 853, 866, 399 N.E.2d 224.) In the present case, defendant was unable to identify Sanchez as the speaker on the tape. The reporter did not record the names of any of the persons who spoke on the tape, and she was unsure whether she could identify any of the voices. Sanchez himself denied having talked to the reporter, so he could not identify his own voice. Furthermore, this tape captured the melee that ensued after a young man had been slain during a street-gang confrontation. Under these circumstances, voice identification would be speculative, and the court acted properly in excluding what defendant alleged was a comment by Flavio Sanchez.

■ Defendant's fourth objection is that the trial judge relied upon an improper *ex parte* conversation when he decided to exclude evidence of a tape recording. The judge called the attorney for WMAQ to ask him if the defense counsel had been granted access to the tape recording prior to trial. This *ex parte* conversation was ill-advised since the judge is limited to the record when he makes a ruling, and a deliberation by the trial judge based upon private knowledge or investigation may constitute a denial of due process in some cases. *People v. Nelson* (1974), 58 Ill. 2d 61, 67, 317 N.E.2d 31.

Under the circumstances of the present case, however, the judge's conversation with WMAQ's attorney did not deprive the defendant of a

fair trial. The record reveals ample justification for the judge's decision to exclude evidence of the tape recording. Moreover, it is apparent from the record that the judge did not base his decision on the fact that counsel for WMAQ claimed that he had offered defendant an opportunity to listen to the tape prior to trial. The judge said that although he had an opinion as to whether defendant had a chance to listen to the tape, he would not express it. The judge noted further, "It's not up to me to make a statement, I don't know anything about it."

 Defendant's fifth objection is that the court erred in allowing the State to adduce evidence at trial that the defendant had shot at Flavio Sanchez on prior occasions. Defendant contends that this evidence was improperly introduced to show that he had a propensity to commit crimes.

Defendant's argument is unpersuasive. He did not object at trial to the admission of this evidence, so he has waived his objection for the purpose of review. (See *People v. Thomas* (1983), 116 Ill. App. 3d 216, 220, 452 N.E.2d 77.) Moreover, this error is not of such magnitude, nor is the evidence so closely balanced that the matter should be reviewed under the plain-error doctrine. See 87 Ill. 2d R. 615(a); *People v. Lucas* (1981), 88 Ill. 2d 245, 251, 430 N.E.2d 1091.

Even if this objection were reviewable, however, it is clear that the court did not err in admitting evidence that the defendant had shot at Flavio Sanchez. Evidence of other crimes is not admissible to show that defendant has a penchant for criminal activity, but such evidence is admissible for any other purpose, including identification, intent, motive or lack of mistake. (*People v. Bartall* (1983), 98 Ill. 2d 294, 310, 456 N.E.2d 59.) In the present case, the fact that the defendant had shot at Sanchez on past occasions was relevant to the issue of identification. One reason that Sanchez was able to recognize the defendant is that the defendant had shot at him in the past. These prior incidents of gang violence showed that the defendant had a motive to shoot Sanchez and the murder victim.

 Defendant's sixth objection is that the court erred in allowing the State to show that he had been charged with illegal possession of a rifle two years prior to trial. According to the defendant, the State should not have been allowed to ask him on cross-examination whether he had ever owned a rifle.

Defendant's argument lacks merit. The purpose of cross-examination is to introduce matters which explain, modify, or discredit evidence introduced on direct examination. (*People v. Adams* (1982), 111 Ill. App. 3d 658, 664, 444 N.E.2d 534.) It is not improper for the State, on cross-examination, to pursue a line of questioning initiated by the

defendant. (*People v. Delaney* (1978), 63 Ill. App. 3d 47, 50, 379 N.E.2d 829.) On direct examination, the defendant testified that he had never shot a rifle in his life. This testimony was critical to the State's case since the murder weapon was a rifle. The defense initiated a line of questions on defendant's experience with a rifle, and it was within the permissible scope of cross-examination for the State to discredit the defendant's testimony by asking him if he had ever owned a rifle.

Defendant also argues that the State should not have been allowed to introduce extrinsic evidence to rebut the testimony that defendant had never owned a rifle. Again, defendant's argument is unpersuasive.

Rebuttal evidence is that which is adduced by the prosecution to explain, repel, contradict, or disprove evidence presented by the accused. (*People v. Bush* (1981), 103 Ill. App. 3d 5, 14, 430 N.E.2d 514.) The decision whether to admit rebuttal testimony is within the sound discretion of the trial court, and its determination will not be reversed absent a showing of abuse of discretion. *People v. Buckner* (1984), 121 Ill. App. 3d 391, 398, 459 N.E.2d 1102.

The trial court in this case did not abuse its discretion by allowing the State to introduce evidence through the testimony of a police officer that the defendant had been charged with illegal possession of a rifle. On cross-examination, the defendant asserted that he had never owned a rifle. The State was justified in discrediting this testimony with evidence that defendant had possessed a rifle two years prior to trial.

It is true that rebuttal testimony is generally deemed inadmissible where it serves merely to contradict a collateral matter. (*People v. Buckner* (1984), 121 Ill. App. 3d 391, 398-99, 459 N.E.2d 1102.) However, evidence that defendant had been charged with possession of a rifle was not merely a collateral matter. The weapon used to kill the murder victim was a rifle. Defendant's possession of a rifle was relevant to the substantive issue of whether he had shot the murder victim. If defendant had never owned a rifle, it is unlikely that he would have used one to shoot a rival gang member. Conversely, if he had possessed a rifle in the past, his experience with a weapon would support the inference that he used a rifle to kill Guatemoc Aguilar. Moreover, when the defendant introduces an issue on direct examination, though collateral to facts which the State must prove as part of its case, defendant's statement may be attacked, both on cross-examination and through rebuttal witnesses. *People v. Buckner* (1984), 121 Ill. App. 3d 391, 399, 459 N.E.2d 1102.

Finally, defendant cites *People v. Brunning* (1981), 95 Ill. App. 3d

673, 420 N.E.2d 587, to support the proposition that the State's rebuttal testimony was inadmissible. The *Brunning* case is distinguishable from the present case, however. In *Brunning*, the State asked the defendant on cross-examination about his prior possession of a gun. The *Brunning* court deemed this cross-examination improper because the defendant had not testified about possession of a gun on direct examination. (95 Ill. App. 3d 673, 676, 420 N.E.2d 587.) The court determined further that rebuttal evidence showing that the defendant had been charged with illegal possession of a gun should not have been received because it was based upon improper cross-examination and thus did not contradict properly admitted defense evidence. 95 Ill. App. 3d 673, 676, 420 N.E.2d 587.

In the present case, the prosecutor's questions about whether defendant had ever owned a gun were proper since the defense counsel had opened the door to this line of inquiry. Unlike the prosecutor in *Brunning*, the prosecutor here had a right to introduce rebuttal evidence based upon his legitimate cross-examination of the defendant.

In light of the foregoing, the judgment of the trial court should be affirmed.

Affirmed.

HARTMAN and SCARIANO, JJ., concur.