No. 2--06--0140     Filed: 1-14-09

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 04--CF--3278 |
| JOHNATHAN J. ROMERO, | ) ) ) | Honorable Richard W. Vidal, |
| Defendant-Appellant. | ) | Judge, Presiding. |

Modified on Denial of Rehearing

PRESIDING JUSTICE ZENOFF delivered the opinion of the court:

Defendant, Johnathan Romero, appeals his conviction of first degree murder (720 ILCS 5/9--1(a)(2) (West 2004)) and his subsequent sentence of 50 years' imprisonment in connection with an incident in which he fatally stabbed another young man, Eric Flynn, at a bonfire party. On appeal, defendant argues that (1) the evidence that defendant acted under an unreasonable belief in the necessity of deadly force in self-defense warrants our reducing his conviction to second degree murder; (2) his conviction should be reversed and the cause remanded for retrial due to the prosecutor's allegedly improper statements during closing rebuttal argument; (3) his sentence was excessive; and (4) the judgment must be corrected to reflect the three years of mandatory supervised release (MSR) statutorily authorized instead of the four years actually imposed. The State concedes the latter point. For the reasons that follow, we affirm as modified.

Defendant's trial took place between November 18 and November 29, 2005. The State's first witness, Flynn's mother, testified that Flynn came home from work on October 2, 2004, shortly after 9 p.m. but left home again at approximately 10:30 or 10:45 p.m. When he left he was wearing blue jeans and a gray sweatshirt.

John Peppers testified next for the State. He testified that October 2 was the night of Auburn High School's homecoming dance and that his younger brother Jeff was planning a bonfire party for that night. Shortly after 10 p.m., after the party had started and after John, who was 21 years old at the time, purchased some alcohol, he picked Flynn up and drove him to the party. When they arrived at John's house, they discovered that John's parents were breaking up the party. The group decided to join another bonfire party at the home of Eric Ellis.

Though there were no streetlights in the area and the pathway leading up to the bonfire area was dark, the bonfire clearing was "pretty bright," and, "as soon as you got into the clearing, *** you could definitely see." John recognized most of the people at the Ellis party as either friends or "friend[s] of friend[s]" whom he had met that night, but he did not know defendant and did not see him at the party. Even though the majority of the partygoers were high school students, most of them were drinking. John stayed at the bonfire for approximately one hour before leaving to meet another friend and also to purchase more alcohol for the party. Flynn remained at the party during John's absence. When John eventually returned to the party, the atmosphere was "panicked," and "[t]here were a lot of cars kinda speeding away." John was informed by the partygoers that Flynn had been stabbed.

Chris Peppers, John's younger brother, testified that he arrived at the Ellis party at approximately 11 p.m. on October 2, after his parents had broken up his party, which had included

his friend Mitch Heaslip and some of Heaslip's friends from Wisconsin. Chris drank five beers over the course of the night, but, though there were "a lot of people" using marijuana at the Ellis party, Chris testified that he did not take any drugs that night. Chris saw his brother John leave after approximately one-half hour in order to purchase more beer, and, after two more of his friends left the party 15 minutes later, Chris wandered away from the bonfire and toward the road. There, he saw an acquaintance named Christina and a person he recognized named Adan arrive with a small group of one girl and three boys whom Chris did not recognize. Chris followed the group back to the bonfire, but he was suspicious of the unknown boys because they were not interacting with the other partygoers but were instead standing to the side of the party.

A short time later, Chris again walked away from the bonfire and toward the road. While he was away, he "started hearing a bunch of noise, yelling and screaming." He ran back to the bonfire and saw what "looked like fifteen people *** just in a big brawl." Chris could not identify any specific people in the brawl, but he noted that the group of unknown boys was no longer standing where he had last seen them. On cross-examination, Chris recalled that, during the fight, he saw Ryan Hatfield standing on a spool, with a six-foot-long metal pole in his hand.

Chris joined a group of people sitting behind some nearby cars and observed the fight from a safe distance. At some point, the group of unknown boys came rushing toward Chris, "screaming and yelling, saying 'We gotta get out of here.' " Chris ran and jumped into a nearby ditch, and from there he saw two cars leave. According to Chris, his brother John arrived at the party within a minute thereafter.

Peter Miller testified next for the State. On October 2, 2004, he and several friends had traveled from Wisconsin to visit Mitch Heaslip, who took them first to the Peppers party and, after

that party was broken up, to the Ellis party. At some point during the Ellis party, a group of people with whom Miller was not familiar arrived; the group did not mingle with the other partygoers. Miller "decide[d] to socialize with them," and thus approached them. Then, "this black dude asked [Miller] what [his] colors were *** or asked [him] what [his] problem was." When Miller attempted to respond with a joke, it did not appear that the stranger "took it as a joke," and "a confrontation happened." One of the boys in the group of strangers "flicked" Miller's hat off into the fire, and Miller shoved him. Miller exchanged cross words with the group as his friends from Wisconsin and some people from Rockford rushed in to break up the fight. Miller and the group reconciled, but, a short time later, he saw a "verbal" argument break out between "the guy in the hoodie and that group." Some people were pulling back the "guy in the hoodie," who Miller later learned was Eric Flynn, when the group "kinda bull rushed him." (When asked what it meant when someone "gets bull rushed," Miller answered, "Self-defense, running back, trying to protect himself, he's in the defensive.") A large fight, involving what Miller estimated on cross-examination as "fifteen, twenty people," broke out. The next time Miller saw Eric Flynn was "[w]hen he *** pulled his hand off of his shirt and said *** 'help' or something" before falling to the ground, bleeding. Miller "could hear him breathing hard and *** could see blood squirting out."

Eric Stone, another partygoer from Wisconsin, was the next witness for the State. He testified that, after Miller's confrontation with the group that was not interacting with the other partygoers, he saw Flynn "standing there" when a "chair [was] thrown right by him and a Mexican started rushing after him, and he was kinda running backwards and stuff." Stone later testified that two people approached Flynn--one wearing an orange shirt and one wearing a gray shirt. Stone testified that the confrontation was "about fifteen, twenty feet away," and that he could "pretty much

see" or could see "pretty clearly." When Flynn was being rushed, he was "rushing backwards," and Stone's imitation of his hand movements was described as follows: "his palms are up at sort of shoulder height with the palms facing out." During redirect examination, Stone indicated that Flynn swung at the two adversaries with the palms of his hands up and his elbows in front of his face. It appeared as if one of Flynn's assailants, who was wearing a gray shirt and gray pants, was punching him in an "awkward," "downward sideways motion" while Flynn "struck out with his fists, probably to block them, trying to get them off of him." Stone was distracted by noises behind him, and, when he turned back around, he saw Flynn, who was on the ground, get up, "take[] like four or five steps *** and fall[] on his face." On cross-examination, Stone agreed that he was intoxicated at the time of the altercations. He also agreed on cross-examination that he never saw a knife.

Brian Coy, another Wisconsin partygoer, testified that he saw the confrontation between Miller and the group of strangers during the Ellis party and that he "kind of stepped forward, [to] make sure nothing was going to happen." When he turned around, he saw "someone stand on [a nearby wooden spool] with a gray sweatshirt on saying everyone needs to respect everybody." Then, "[s]omeone pushed the spool over and he fell down," and three people began "kicking him, beating him up" while he was on the ground. Though he testified that he was not intoxicated at the time of the incident, Coy stated that he could not "really see" who was involved in the altercations that followed, because it was dark and the three people had their backs turned to him. When next he saw the person in the gray sweatshirt (which he also described as a hooded sweatshirt) approximately 10 minutes later, the person "stumbled over by [him] and fell over by [his] feet."

John Gillitzer, yet another partygoer from Wisconsin, testified that he met Flynn, who was wearing a gray hooded sweatshirt, that night at the Ellis party. After Miller's confrontation with the

group of strangers, Gillitzer saw someone yelling at the group, " 'Don't disrespect me, we're here to have fun.' " Gillitzer testified that he then saw two of the strangers push someone off the wooden spool, but he could not tell who was pushed off the spool. On cross-examination, Gillitzer stated that Flynn was not the person who was pushed off the spool but was the person who told others not to disrespect him. Gillitzer did not see Flynn during the altercations that followed, and, the next time Gillitzer saw Flynn, he saw a Hispanic male wearing an orange shirt "hit him in the face and then that same guy came back and hit him in the chest." Gillitzer looked away, and Flynn came up to him "gasping for air."

One of Flynn's friends, Ryan Hatfield, testified that Flynn was wearing a dark gray hooded sweatshirt at the Ellis party on October 2, 2004. Hatfield recalled that, during the Ellis party, a group of strangers arrived with a person he knew named Adan, and the group did not interact with the remaining partygoers. At some point during the party, Hatfield saw Flynn arguing with the group, and Hatfield tried to remove Flynn from the argument. Hatfield recalled that, "as [they] were walking [away from the confrontation,] the group of people came after [him] and [Flynn]." Hatfield was punched in the nose during the encounter. Hatfield recalled that, "[a]fter everybody scattered away from that [,] [Hatfield] walked back over by the fire and Adan grabbed [Hatfield] and threw [him] into the trees and had [him] around by [his] neck, and then one of [Adan's] buddies came and grabbed [Adan] off [Hatfield] and said *** ['] we got to go[.']" Hatfield recalled under cross-examination that he grabbed a nearby metal pole after Adan had been pulled off of him. Also on cross-examination, Hatfield estimated that his encounter with Adan likely lasted less than one minute. Once Adan and Hatfield were separated, the strangers left, and Hatfield saw Flynn being lifted onto a truck to be taken to the hospital. Hatfield stated that he had stood atop a wooden spool

at one point during the party and that he did not see anyone else on the wooden spool during the party.

After the testimony of the police officer who collected physical evidence related to the case, the State called Daniel Romero, defendant's brother, to testify. He recalled that he and defendant, along with two girls and four other boys, went to a bonfire party on the night of October 2, 2004. Daniel wore gray pants and a gray T-shirt to the party. Daniel testified that someone wearing a strange hat approached his group to ask for drugs, and an argument between Adan and the person ensued. According to Daniel's testimony, a fight between defendant and another boy broke out at that point, but Daniel did not see any of that fight because his attention was directed toward Adan. Under further questioning, Daniel agreed that he had told police that the other boy had gotten in defendant's face, that Daniel had tried to keep the two apart using his arms, and that defendant took out a knife for protection, but Daniel asserted that he was "just agreeing" to those statements because they were what the police were telling him. When asked if he told police that defendant cut him while he was trying to keep the two people apart, Daniel answered that "[t]hat's what the police said." However, upon being shown pictures of him and of his clothing from that night, Daniel agreed that he had an injury on his arm and that his clothes had blood on them. Daniel testified later that he did not know how he got the injury to his arm. Later under direct examination, Daniel agreed when asked if he was "the only person that stepped between [defendant] and the [Flynn]." Daniel also agreed that, while he was standing between defendant and Flynn, Flynn did not have anything in his hands and did not hit defendant. Daniel recalled seeing blood on defendant's butterfly knife once they had returned to their car to leave the party. On cross-examination, Daniel stated that during the car ride home defendant said that he stabbed the other person "because they were jumping him."

Detective Vincent Lindberg, who questioned Daniel on the day after the incident, testified next for the State. He testified that Daniel at first said that he had been asleep by 8 p.m. the previous night, but, when Lindberg confronted Daniel by indicating that he knew about Daniel's whereabouts the previous night, Daniel told Lindberg that Flynn had gotten "in his brother's face," that he tried to separate the two, that defendant pulled out a butterfly knife and stabbed Flynn, and that defendant cut him as he was trying to separate Flynn and defendant. Lindberg took two written statements from Daniel. Both statements were consistent with Lindberg's testimony regarding Daniel's responses during questioning, but, in the second statement, Daniel added that, though none of the other partygoers appeared to have any weapons, defendant may have wielded his knife because he anticipated that two other people would join Flynn in fighting him. Lindberg testified that, though he and not Daniel handwrote the first statement and typed the second, Daniel confirmed the accuracy of the statements.

After testimony from a police officer who went with a prosecutor to speak with Daniel, an officer who collected a DNA swab from Daniel, and the court reporter who transcribed Daniel's grand jury testimony, the State called Officer Frank Ingardona of the Rockford police department to testify. Ingardona testified regarding his extensive training in martial arts, and he stated that he was familiar with butterfly knives. Ingardona said that one would not be able to open a butterfly knife safely with one hand without practice and that it took him "quite awhile" to learn how to do so himself.

After the testimony of a crime scene technician, the State elicited testimony from three forensics specialists and entered a stipulation regarding the testimony of another. One of the specialists, a pathologist, testified that Flynn suffered up to five stab wounds (one of Flynn's wounds

might have been made during medical treatment), including a through-and-through knife wound that produced two cuts on Flynn's left arm, a fatal knife wound that pierced "all the way through the left ventrical [sic] and *** through the posterior portion of the heart," and a potentially fatal knife wound to the lung. The pathologist stated that the heart wound was inflicted by "a deliberate force," akin to the force required to stab a knife through a roast. The pathologist also testified that Flynn died with a blood alcohol level of 0.081. After the pathologist's testimony, the State rested its case.

Defendant's first witness, David Cruz, testified that, on October 2, 2004, he and a group of six other boys, including defendant and defendant's brother, and some girls went together to a bonfire party. Cruz stated that nobody in the group was wearing an orange shirt and that defendant was wearing blue jeans and a blue plaid shirt. When they arrived at the party, Flynn walked up to the group and, in a tone that struck Cruz as "upset," asked them who they were. Once the girls introduced their group, "everything was fine." The girls from the group mingled, but the boys in the group stayed to themselves until someone approached the group to ask for drugs and one of the group members "smacked" the hat off his head. After that, Cruz saw fights break out, but he did not see Flynn during the fighting.

Danielle Zobal, one of the girls who traveled to the party with defendant, testified that she was talking to someone when she looked over and saw someone retrieving his hat from the bonfire after it had been knocked off his head. Zobal recalled that "everything was fine for a couple minutes" afterwards. She walked with Cruz away from the crowd, and, when they returned, "everybody was arguing, and then after that everybody just started fighting." She did not see defendant or Flynn fighting, but she did see Flynn lying on the ground with a stab wound shortly thereafter. As she and her group drove away from the party, Zobal saw that "all of them" had

"bruises an [sic] scrapes" and the corduroy sweatshirt defendant was wearing was torn. She also recalled seeing scratches on defendant's hands.

After the testimony of a private investigator for the defense who had difficulty obtaining an interview with a prosecution witness, Travis Triplett testified for the defense. Triplett was another member of the group that accompanied defendant to the Ellis party. Fifteen minutes after the group arrived at the party, one of the partygoers approached Triplett to try to acquire drugs, and "somebody proceeded to knock his hat off his head and throw it into the bonfire." Just when tempers cooled, Triplett saw Flynn standing atop a wooden spool, yelling that the group needed to watch what they were doing and not disrespect him or the party. According to Triplett, Flynn told the group, " [']you don't know what we can do to you, we're going to basically fuck you up.['] " One of Flynn's friends grabbed him to remove him in order to ease tensions, but Triplett heard Flynn say, " [']You heard what I said, get out or you're going to get your ass whooped.['] " Then, Triplett recalled, "the guys that were in our group go running towards all the guys in their group." Triplett tried to break up the ensuing fights and leave with his group. As he was leaving, he saw Flynn fall to the ground. Triplett stayed to help Flynn while the rest of his group left.

Defendant next testified on his own behalf. He testified that, on October 2, his brother Daniel and a friend picked him up at his house. Defendant was wearing blue jeans and a flannel plaid shirt; he did not recall anyone from their group wearing anything orange. When he entered the car, he had in his pocket a butterfly knife, which Daniel had bought him, that he had been "playing around with" and "[o]pening" and "flipping" earlier in the day. They went to Adan Ibarra's house, where they met Adan, David Cruz, and three girls, including Danielle Zobal. They left for the bonfire party and picked up Travis Triplett on the way. When they arrived at the party, a "[c]ouple

guys came up and told [them] to come on in the party [sic] after they were talking to some of the girls." Defendant and his group had been at the party for approximately 20 or 25 minutes when someone walked up to the group to ask for drugs and a member of the group knocked off that person's hat. Defendant recalled that Adan then began yelling at the person who asked for drugs, because Adan believed him to be a "snitch," "[a]nd then Adan started getting into it with [Flynn]." As Adan and Flynn argued, Daniel joined a group of people trying to separate the two, and defendant tried to "grab [Daniel] to get away." Defendant continued: "They started walking away, and everybody somehow moved toward the other side of the bonfire and another fight started going on." According to defendant, the next thing he remembered was "looking over and [his] brother was getting jumped by two guys." Defendant "went over, pushed [those] guys off of [his] brother." Defendant stated that Flynn was one of Daniel's two adversaries. After defendant pushed Flynn off of Daniel, Flynn started "coming after [defendant]" and "raised his fist." Defendant "pulled out the knife and then [Flynn] struck [defendant]" "in the face area." Defendant stated that he pulled out the knife because two people were coming at him and he "thought [he] was going to get hurt." Defendant "tr[ied] to get away from him" by "sticking him with the knife" "[t]wo or three" times. Though defendant believed that stabbing Flynn would cause him harm, defendant was not trying to kill Flynn. When defendant stabbed Flynn, the altercation stopped, and defendant and his group left to return to Adan's house. Defendant threw the knife into a river and returned home later that night.

Police arrived at defendant's house the next morning and took him to the police department for questioning. At trial, defendant admitted that he initially lied to police about whether he stabbed Flynn, even after police confronted him with Daniel's statement that defendant had stabbed Flynn,

but defendant eventually told police that he had stabbed Flynn and gave them a statement to that effect.

On cross-examination, defendant agreed that he had played with the butterfly knife a number of times before that night, that he did not cut himself at all when he was playing with the weapon, that he had no problem flipping it open, and that he could bounce it off of his hand "pretty easily." He also agreed that his mother had implored him and his brother not to carry knives with them, but defendant asserted that the advice was directed more toward his brother, who "always collected knives." Defendant further agreed that, when he saw Flynn raise his hand or fist, he did not see anything in Flynn's hand, but defendant said that he did not know if Flynn had anything in his hand, because it was dark. Defendant agreed that there was no apparent injury to his face as a result of Flynn's punching him. Defendant acknowledged that, in his written statement to police, he indicated that one of the two people who attacked him "took off" when he drew his knife. Defendant testified that he thought the second person took off, because he did not know where the person was afterwards, but defendant asserted that he "didn't know for sure if [the person] kept on coming at [him]."

The defense rested after defendant's testimony, and, after the testimony of three rebuttal witnesses regarding statements made to the police (including testimony that defendant did not mention in interviews just after the incident that he had acted in self-defense or that he had been struck before stabbing Flynn), both sides presented closing arguments. The jury found defendant guilty of first degree murder, and the trial court subsequently sentenced him to 50 years' imprisonment and a 4-year term of MSR. Defendant timely appeals.

Defendant's first argument is that his conviction must be reduced to a conviction of second degree murder because the evidence showed that he acted with an unreasonable belief that there were circumstances present to justify his use of deadly force against Flynn. Pursuant to section 9--2 of the Criminal Code of 1961 (Code):

"(a) A person commits the offense of second degree murder when he commits the offense of first degree murder *** and either of the following mitigating factors are present:

***

(2) At the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing [as self-defense], but his belief is unreasonable.

***

(c) When a defendant is on trial for first degree murder and evidence of either of the mitigating factors *** has been presented, the burden of proof is on the defendant to prove either mitigating factor by a preponderance of the evidence ***. However, the burden of proof remains on the State to prove beyond a reasonable doubt each of the elements of first degree murder and, when appropriately raised, the absence of circumstances at the time of the killing that would justify or exonerate the killing under the principles stated in Article 7 of this Code. In a jury trial for first degree murder in which evidence of either of the mitigating factors *** has been presented and the defendant has requested that the jury be given the option of finding the defendant guilty of second degree murder, the jury must be instructed that it may not consider whether the defendant has met his burden of proof with regard to second degree murder until and unless it has first determined that the State has

-13-

proven beyond a reasonable doubt each of the elements of first degree murder." 720 ILCS 5/9--2 (West 2004).

The parties disagree as to the standard of appellate review applicable to defendant's claim that the trier of fact erred in finding him guilty of first degree murder rather than second degree murder. Defendant argues that, while we normally review the sufficiency of the evidence to support a criminal conviction by determining whether any rational trier of fact could have found the elements of the crime proven beyond a reasonable doubt, we should employ the manifest-weight-of-the-evidence standard to review the jury's finding that defendant's guilt should not be mitigated to second, rather than first, degree murder. The State initially disputed defendant's position and insisted that "a defendant's conviction for first-degree murder should not be modified to second-degree murder unless a rational trier of fact, after viewing the evidence in the light most favorable to the prosecution, could not have found the elements of first-degree murder and could not have found, beyond a reasonable doubt, that defendant did not act in self defense. People v. Lee, 213 Ill. 2d 218, 224 [(2004)]." However, at oral argument, the State conceded that defendant is correct on this point. We disagree.

For its original position, the State relied on Lee, a case in which the supreme court articulated the standard of review for a jury's determination that the defendant did not act in self-defense under section 7--1 of the Code. See Lee, 213 Ill. 2d at 225, citing 720 ILCS 5/7--1 (West 1998). Here, however, the question is not whether defendant acted in self-defense so as to justify his actions. The question is whether he possessed an unreasonable belief that self-defense was justified, so as to mitigate his guilt but not "justify or exonerate the killing." The difference in this context is that lack of self-defense, when self-defense is raised, is an element of first or second degree murder. See 720

ILCS 5/7--14 (West 2004) ("A defense of justifiable use of force *** is an affirmative defense"); 720 ILCS 5/3--2(b) (West 2004) (where affirmative defense is raised, "the State must sustain the burden of proving the defendant guilty beyond a reasonable doubt as to [the affirmative defense] together with all the other elements of the offense").  By contrast, the presence of a mitigating factor is not an element of second degree murder--it mitigates culpability on the already established elements of first degree murder.  Or, as stated in People v. Jerome, 206 Ill. App. 3d 428, 436 (1990):

"When a defendant is charged with first-degree murder, the State is required to prove death, causation and intent ***. [Citation.] The defendant then has the opportunity to prove provocation or unreasonable belief in justification to reduce the offense to second-degree murder. [Citation.] The existence of provocation or an unreasonable belief in justification, however, will not diminish or negate any of the proved elements of first-degree murder. The mitigating factor is a separate issue the existence of which the State is willing to recognize as a circumstance affecting the degree of culpability or the severity of punishment."

While due process requires that the State bear the burden of proving beyond a reasonable doubt all of the elements of a crime in order to obtain a conviction (In re Winship, 397 U.S. 358, 364, 25 L. Ed. 2d 368, 375, 90 S. Ct. 1068, 1073 (1970)), due process does not require that the State disprove mitigating factors beyond a reasonable doubt where their absence is not an element of the crime.  Patterson v. New York, 432 U.S. 207, 53 L. Ed. 2d 281, 97 S. Ct. 2319 (1977).[1]  Nor does

---

[1]Due process also does not require that the State disprove affirmative defenses beyond a reasonable doubt where their absence is not an element of the crime. Patterson, 432 U.S. at 211, 53 L. Ed. 2d at 292, 97 S. Ct. at 2327. However, Illinois law provides that, where a defendant raises an affirmative defense other than insanity, the State must disprove it beyond a reasonable doubt just as it must prove the elements of the crime beyond a reasonable doubt. 720 ILCS 5/3--2(b) (West 2004).

Illinois law. Once the State has met its burden to prove the elements of first degree murder, the burden shifts to the defendant wishing to mitigate the offense to second degree murder to prove the existence of one of the statutory mitigating factors by a preponderance of the evidence. Lopez, 166 Ill. 2d at 447; see 720 ILCS 5/9--2(c) (West 2004).

Our research has uncovered published Illinois decisions that support the notion that the State bears the burden to disprove any mitigating circumstances beyond a reasonable doubt in order to obtain a conviction of first, rather than second, degree murder. See People v. Thompson, 354 Ill. App. 3d 579, 586 (2004) ("Once the defendant carries his burden of proving any of the factors in mitigation, the burden shifts back to the State to prove the absence of the implicated mitigating factors beyond a reasonable doubt"); People v. Izquierdo-Flores, 332 Ill. App. 3d 632, 638 (2002) ("If the defendant meets [the burden to prove the presence of a mitigating factor by a preponderance of the evidence], then the State must disprove beyond a reasonable doubt any mitigating factor that the defendant has raised"); People v. Golden, 244 Ill. App. 3d 908, 919 (1993) (if the defendant presents mitigating evidence, "the State must disprove those factors beyond a reasonable doubt"); People v. Buckner, 203 Ill. App. 3d 525, 534 (1990) (if the trier of fact finds that the defendant has established a mitigating factor by a preponderance of the evidence, "the State must disprove such factor(s) by proof beyond a reasonable doubt"). These cases misstate the law. Illinois's statutory scheme nowhere provides that the State must disprove a mitigating factor beyond a reasonable doubt after a defendant has established a mitigating factor by a preponderance of the evidence. Section 9--2(c) provides that the State must disprove "the absence of circumstances at the time of the killing that would justify or exonerate the killing under the principles stated in Article 7 of this Code" (720 ILCS 5/9--2(c) (West 2004)), but it does not say the same for circumstances that would mitigate an

offense from first degree murder to second degree murder. Instead, section 9--2(c) provides that "the burden of proof is on the defendant to prove either mitigating factor by a preponderance of the evidence before the defendant can be found guilty of second degree murder." 720 ILCS 5/9--2(c) (West 2004). In fact, section 9--2(c) has withstood numerous constitutional challenges raised precisely because it shifts the burden to the defendant to prove the existence of a mitigating factor instead of requiring the State to disprove it beyond a reasonable doubt. See People v. Jeffries, 164 Ill. 2d 104, 114-19 (1995); People v. Hooker, 249 Ill. App. 3d 394, 406 (1993) (collecting cases); People v. Guidry, 220 Ill. App. 3d 406, 412 (1991) (collecting cases); People v. Cook, 217 Ill. App. 3d 299, 301-05 (1991); People v. Brown, 218 Ill. App. 3d 890, 895-97 (1991); Buckner, 203 Ill. App. 3d at 529-34.[2]

Further, the approach specified in Izquierdo-Flores and Buckner, which both state that the State must disprove mitigating circumstances beyond a reasonable doubt after the defendant establishes them by a preponderance of the evidence, does not reflect current practice. In a jury trial, the way to determine if mitigating factors had been proven by a preponderance of the evidence would be to submit the question to the jury. Thus, under Izquierdo-Flores and Buckner, all second degree murder trials would be bifurcated so that the jury would return a verdict of guilty (with mitigating circumstances proven by a preponderance of the evidence), and then proofs would be reopened for

---

[2]We note that the decision in Buckner is particularly odd, because it rejects the defendant's argument that section 9--2 "improperly shifted the burden of proof to him" (Buckner, 203 Ill. App. 3d at 529) yet still misstates the law by saying, without supporting authority, that, if the trier of fact finds mitigating factors to have been established by a preponderance of the evidence, "the State must disprove such factor(s) by proof beyond a reasonable doubt" (Buckner, 203 Ill. App. 3d at 534).

the State to make its case to disprove the mitigating factors beyond a reasonable doubt. Again, this is not the law.

In an appeal challenging a factual determination that no mitigating factor was present, the question presented is not whether a reasonable fact finder could have found that the State disproved the mitigating factor beyond a reasonable doubt but, rather, whether the fact finder correctly concluded that the defendant did not prove the existence of a mitigating factor by a preponderance of the evidence. The question of whether a defendant's actions were committed under mitigating circumstances--here, the question of whether defendant unreasonably believed that circumstances justifying the use of lethal force were present--presents a question of fact. Cf. People v. Urdiales, 225 Ill. 2d 354, 428 (2007) ("As is the case when a defendant raises a defense of insanity, for which a defendant also bears the burden of proof, the existence of 'mental illness' *** is a question of fact"). Normally, we would not overturn the decision of the trier of fact on such a factual issue unless the finding is against the manifest weight of the evidence. See Urdiales, 225 Ill. 2d at 428 (invoking manifest weight review where defendant challenged a finding that he did not prove his mental illness by a preponderance of the evidence); People v. Johnson, 146 Ill. 2d 109, 128-29 (1991) (same for insanity). However, in two more recent cases, our supreme court has applied the standard that, where a defendant argues that he presented sufficient evidence to prove a mitigating factor in a first or second degree murder case, the reviewing court must consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the mitigating factors were not present." People v. Blackwell, 171 Ill. 2d 338, 358 (1996); see also People v. Reid, 179 Ill. 2d 297, 308 (1997) (citing Blackwell for the same proposition). We

-18-

must follow our supreme court's most recent pronouncements on the issue, and we therefore apply the standard articulated in Blackwell and continued in Reid.

In pressing his argument that the evidence established that he acted with an unreasonable belief that circumstances existed to justify his use of force, defendant emphasizes evidence that there was brawling at the party and that Flynn had threatened defendant's group. He also points to testimony that two boys, including Flynn, attacked his brother and later attacked him, and he notes that the testimony that it was dark outside at the time of the incident lends credence to his claim that he could not see if Flynn was brandishing a weapon. Finally, defendant relies on his relative youth and the rapid nature of the encounter as factors that limited his ability to fully and rationally consider the situation before reacting. We agree with defendant that all of the above evidence could be interpreted to support his claim of unreasonable self-defense. However, contrary to defendant's argument, there was also evidence to negate his claim of unreasonable self-defense. Miller testified that defendant's group "bull rushed" Flynn while Flynn was being pulled back and was "in the defensive." Stone testified that two people from defendant's group "rush[ed] after" Flynn while Flynn was "running backwards" and in a defensive position. Though he did not witness the stabbing, Hatfield testified that defendant's group was the aggressor in the confrontation with Flynn. Triplett testified that people from defendant's group went "running towards" other partygoers.

Defendant disputes this evidence by emphasizing that no witness directly stated that he was among the group who rushed toward Flynn. However, even without testimony directly identifying defendant as being among the initial aggressors, the evidence nevertheless presented the strong implication that defendant was among the group. Defendant also observes that Stone described the clothing of the people he saw rush Flynn and that neither of his descriptions matched other witnesses'

descriptions of defendant's clothing that night. (Stone recalled that the two partygoers who approached Flynn were wearing an orange shirt and a gray shirt; other testimony indicated that defendant was wearing a blue shirt.) However, much of the testimony describing the events surrounding the stabbing was either hazy or irreconcilable with other witnesses' accounts. In attempting to sort the testimony, the jury could reasonably have discarded Stone's recollection of the details of the combatants' attire. In sum, while defendant presented some testimony to support his assertion that he acted in unreasonable self-defense (and while he highlights some evidence that could be seen to undercut the State's position), there was also testimony to support the State's position that he did not act in unreasonable self-defense.

It is the responsibility of the trier of fact to determine the credibility of witnesses, the weight to be given to their testimony, and the reasonable inferences to be drawn from the evidence. People v. Brisbon, 106 Ill. 2d 342, 360 (1985). Thus, it was within the province of the jury to find the testimony of the above witnesses more credible than the testimony of defendant. Indeed, the record reveals several reasons the jury may have reasonably discredited defendant's testimony. Defendant testified that he stabbed Flynn in part because he thought he was going to be "jumped" by two people. However, defendant's written statement indicated that the person standing next to Flynn ran away as soon as defendant drew his knife. Defendant testified that Flynn had hit him in the face, yet defendant bore no physical indicia of such a blow immediately after the incident. The jury could have interpreted this evidence as discrediting defendant's claim that Flynn punched him. Or, on the contrary, defendant testified that he thought Flynn's raised hand may have carried a weapon, but defendant did not stab Flynn until after Flynn punched him. The jury could have inferred that Flynn punched defendant but that Flynn's punching defendant would have revealed that Flynn was not

wielding a weapon.[3] Defendant also acknowledged giving misinformation to the police. Likewise, defendant's brother, who testified in a manner generally favorable to defendant, acknowledged misleading police on this case and also contradicted written statements he had given police.

Based on the record before us, we conclude that the combined testimony of all of the witnesses provided ample evidentiary support for the conclusion that defendant did not act under an unreasonable belief in the need for self-defense. Accordingly, we hold that, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found that defendant failed to prove a mitigating circumstance, and we reject defendant's argument to the contrary.

Defendant's second argument on appeal is that his conviction should be reversed and this cause remanded for retrial due to the prosecutor's allegedly improper statements during closing rebuttal argument. A prosecutor is afforded wide latitude in making closing arguments. People v. Blue, 189 Ill. 2d 99, 127 (2000). In closing arguments, the State may comment on the evidence and all of the reasonable inferences arising from the evidence. Blue, 189 Ill. 2d at 127. Closing arguments are to be viewed in their entirety, and any allegedly improper argument must be viewed in its context within the closing argument as a whole. Blue, 189 Ill. 2d at 128.

Defendant highlights two aspects of the State's closing rebuttal argument as improper. First, defendant argues that the prosecutor misstated the law on second degree murder by telling the jury

---

[3]We recognize the inconsistency between the notion that the jury may not have believed defendant because it did not believe that Flynn punched him and the notion that the jury did not believe defendant because it believed Flynn's punching him discredited defendant's claim that he thought Flynn had a weapon. However, our role in examining the evidence requires us to examine all the reasonable inferences to be drawn from the evidence to determine if there is evidentiary support for any ground upon which the jury may have rested its finding.

that defendant's belief was irrelevant. For this contention, defendant relies on the following passages from the State's rebuttal argument:

"His belief was clear, reasonable or unreasonable, it doesn't matter, it's not enough, it [sic] was unjustified in using deadly force."

And: "Nothing he believed justified his crimes."

The defense did not object to these comments when the State made them. Though a defendant's failure to raise both a contemporaneous objection and a posttrial objection normally results in his waiver of the same objection on appeal (People v. Enoch, 122 Ill. 2d 176, 186 (1988) (in order to preserve an issue on appeal, a defendant must both raise a contemporaneous objection and raise it in his posttrial motion)), defendant urges that we review this issue as plain error. See 134 Ill. 2d R. 615(a). "[T]he plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurs and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurs and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." People v. Piatkowski, 225 Ill. 2d 551, 565 (2007).

The first step of the inquiry under the plain error doctrine is to determine if the challenged comment constituted error. Piatkowski, 225 Ill. 2d at 565. If so, then we proceed to determine whether either of the two prongs is satisfied: whether the error affected the fairness of the trial process or whether the evidence was closely balanced. Piatkowski, 225 Ill. 2d at 566. The State argues that, when the above quotes are considered in their full context, they do not demonstrate error, much less plain error. We agree with the State.

The above statements from the prosecutor's closing rebuttal argument appear in context as follows:

"As to the Defendant's theory, you might call it mistaken self-defense. If things were as this defendant thought they were, the question is was he entitled to use deadly force. If he made an unreasonable assumption about the facts, a mistake, is he excused from his conduct so that the crime is reduced to second degree murder?

[DEFENSE COUNSEL]: Objection, Your Honor.

THE COURT: Overruled.

I'll give you what the instructions are. I'll read them to you. Be sure if the attorneys misstate the instructions in any way, pay attention what [sic] I tell you and give you in way [sic] of written instructions.

Proceed.

[STATE'S ATTORNEY]: I'll read it too. *** [A] mitigating factor[] exists so as to reduce the offense of first degree murder to the lesser offense of second degree murder if at the time of the killing the defendant believes that circumstances exist which would justify the deadly force he uses, but his belief that such circumstances exist is unreasonable.

So ask yourself what are the circumstances that this defendant believed were going on at the time. *** When you evaluate the defendant's claim, pay special attention to the instruction on justification and when someone is justified in using deadly force, because what the instruction says is a person is justified *** only if he reasonably believes that such force is necessary to prevent death or great bodily harm to himself.

The burden is on the defendant to show this mitigating factor, that this defendant's fear was so great, that his fear of this tall, skinny kid was so great ***, that he was justified in using deadly force. And remember what this defendant failed to say. We know what his state of mind is because he told us. All he said was he was afraid of being hurt. *** And, Ladies and Gentlemen, without more it doesn't meet the burden. Fear is not a justification. Chaos is not a justification. Size is not a justification. What this defendant actually believed at the time was that he was going to stab Eric Flynn. He told you that. *** His belief was clear, reasonable or unreasonable, it doesn't matter, it's not enough, it [sic] was unjustified in using deadly force.

* * *

Nobody hit this defendant. Nobody came to this defendant with a weapon. This defendant told [police] what happened. 'When he got close enough to me, I took my knife and stuck him in the chest two times, maybe more.' Nothing he believed justified his crimes." (Emphases added.)

In their full context, the above emphasized comments convey the prosecutor's argument that defendant offered no evidence of a belief, reasonable or not, that would justify his use of lethal force against Flynn. The prosecutor was not arguing that, if defendant believed circumstances existed that would justify his use of lethal force, that belief was irrelevant. Rather, the prosecutor was arguing that the particular circumstances defendant testified he believed were present would not have justified his stabbing Flynn, regardless of whether defendant reasonably or unreasonably believed that those circumstances existed. This argument does not misstate the law. We therefore find no error, plain or otherwise, based on the above passages.

The second allegedly improper prosecution statement is the following characterization of defendant's actions: "These were not the mistaken flailings of a frightened boy, these were the cold, determined, and deliberate acts of an <u>experienced knife fighter</u>." (Emphasis in original.) Again, we consider the quote in its full context:

"He stabbed Eric Flynn, and the defendant wants you to believe that in a panic he pulls out his trusty butterfly knife, flips it open safely, and then in the heat of a fearsome attack he sticks this butterfly knife through Eric Flynn's upper arm \*\*\*. \*\*\* Two of this Defendant's knife thrusts landed exactly where this practiced knife-wielder intended, in the core of Eric Flynn's body. In spite of his fear, in spite of the chaos, in spite of his impulse he accurately lands a three-inch stab wound into the upper chest of Eric Flynn's body puncturing his lung three inches deep. He deliberately lands another blow in the center of Eric's chest piercing Eric's heart through and through. <u>These were not the mistaken flailings of a frightened boy, these were the cold, determined, and deliberate acts of an experienced knife fighter.</u>" (Emphasis added.)

The full context of the above quote casts the emphasized portion as part of a proper rebuttal to the assertion that defendant stabbed Flynn out of fear. However, the crux of defendant's objection is not the emphasized sentence as a whole, but instead the prosecutor's characterization of defendant as "an experienced knife fighter." Defendant's argument on this point has two prongs: first, he argues that the evidence did not support the assertion that he was an experienced knife fighter, and, second, he argues that, even if he were an experienced knife fighter, the statement was unduly prejudicial because it implied that defendant had been involved in similar stabbing incidents. We consider each point in turn.

First, we consider whether the prosecutor's statement mischaracterized the evidence. As noted above, in closing arguments, the State may comment on the evidence and all of the reasonable inferences arising from the evidence. Blue, 189 Ill. 2d at 127. Defendant asserts that there was "absolutely no evidence presented in this case from which one could reasonably infer that [defendant] was an experienced knife fighter, or that he had ever been in a knife fight in the past." We disagree with defendant's approach. Read in its full context, the prosecutor's description of defendant as an "experienced knife fighter" does not beg a literal interpretation. Rather, the comment came as part of a rebuttal to an argument that defendant acted out of panicked fear; the comment emphasized defendant's advantage in the fight with Flynn.

Further, we are not convinced that the prosecutor's comment strayed unduly from the evidence. The State elicited testimony from Officer Ingardona that it took him some time to acquire an expertise in using a butterfly knife; that testimony could support an inference that defendant's ability to wield a butterfly knife (and to handle one, as defendant testified he did casually on the day of the incident) exceeded that of the average person. Also, as the prosecutor pointed out in closing rebuttal argument, the nature of Flynn's wounds--even in the midst of the excitement of the incident, defendant was able to stab Flynn twice "in the core of [his] body"--could certainly support an inference that defendant was capable in handling the knife. Though the further inference that defendant had experience in knife fighting may have been weaker, we do not believe that, in context, the prosecutor's reference to defendant's being an "experienced knife fighter" was meant to be taken as literally as defendant would now have it. In short, we view the prosecutor's comment as a dramatic way of emphasizing the evidence that defendant was skilled with a knife, in the context of arguing that defendant enjoyed a clear advantage during the encounter.

Second, we consider whether the prosecutor's statement was unduly prejudicial because it implied that defendant had been involved in similar stabbing incidents. We do not agree with defendant that the import of the prosecutor's statement was that defendant had committed other bad acts and thus likely committed a bad act here. Again, in our view, the prosecutor's statement advanced the argument that defendant was not panicked or overmatched during the confrontation but instead set out to stab Flynn without subjective justification. Thus, we disagree with defendant that the above statement was used to "emphasize that *** defendant has committed a similar crime in order to prove that the defendant committed the crime charged."

For this reason, we distinguish the current case from People v. Tenny, 224 Ill. App. 3d 53 (1991), a case that defendant argues is closely analogous to the current case. In Tenny, the defendant was convicted of murder for his part in an incident in which a group of five people met at a pool hall, traveled to a home, and killed the two people inside the home. During closing argument, the prosecutor told the jury that three of the five accomplices, including the defendant, " 'entered [the pool hall] together and that indicated and is evidence of the fact that they were working together that night as a sophisticated, experienced team of killers.' " Tenny, 224 Ill. App. 3d at 63. The court, which had already reversed and remanded the cause on an unrelated issue, deemed the prosecutor's statement improper because it was "designed to convince the jury that the defendant had participated in other killings with [the two other men]." Tenny, 224 Ill. App. 3d at 63. The defendant's principal argument was that he did not participate in the killings at issue. Tenny, 224 Ill. App. 3d at 59. The prosecutor's statement that the defendant was part of a "sophisticated, experienced team of killers" therefore could not have been meant to rebut any assertion that the defendant was overmatched or afraid--its context reveals it as a gratuitous comment that suggested an impermissible and irrelevant

inference. Here, by contrast, as we explained above, the full context of the prosecutor's description of defendant as an "experienced knife fighter" suggests that it was not meant to imply literally that defendant had been involved in previous knife fights. Rather, the statement served the purpose of emphasizing defendant's advantage in the fight and thus rebutting his assertion that he acted out of fear. For this reason, we deem Tenny inapposite, and we reject defendant's arguments regarding the prosecutor's closing argument. As we hold that none of the prosecutor's statements during closing rebuttal argument were improper, we reject defendant's argument that his conviction must be reversed due to prosecutorial misconduct.

Defendant's third argument on appeal is that his sentence was excessive. Before addressing that argument, we recount the evidence presented at defendant's sentencing hearing. The State's first witness at the sentencing hearing, Marcus Elmore, testified that defendant and a group of people damaged property at Elmore's house. Elmore testified that defendant "had [a] bat and started banging on the door; busted a couple windows out of the house, knocked down the mailbox and the front gate." Sonja Robles, who lived in the same house, testified that, for several weeks after defendant beat on her house, she saw defendant in a black car driving past her house three or four times a week.

Gary Anderson, a corrections officer, testified regarding an incident in which defendant and another inmate entered into a fight. Anderson recalled that defendant was agitated and yelling and that he was struggling with the two other corrections officers who were trying to restrain him. It became necessary for the officers to restrain defendant by "forcing him into a wall." Anderson agreed that, according to a statement defendant later gave, the fight did not start until the other inmate had taken off his handcuffs and begun moving toward defendant. Another corrections

officer, Matthew Bunk, testified that defendant admitted to having placed gang graffiti on prison walls and also admitted to being part of a particular street gang.

Mike Tischman, defendant's former juvenile probation officer, testified that he referred defendant to an anger management program, which defendant "barely attended," and two drug and alcohol programs, one of which defendant did not attend and one of which defendant completed successfully. Tischman also referred defendant to a mentoring program, but defendant did not participate in the program. Tischman recalled that defendant had several behavioral problems at school during the 16 months Tischman served as his probation officer. Jodee Hungness, the probation officer who took over defendant's case from Tischman, testified that defendant made progress at a drug and alcohol program Tischman had referred him to, but that upon release defendant had a relapse that caused Hungness to refer him to another program. Defendant attended that program, but he did not complete an anger management program to which Hungness referred him. Defendant's attendance at school was also sporadic. Hungness was never told that defendant was having trouble finding transportation to any programs.

After Flynn's parents testified regarding their loss and read a victim impact statement, the defense called defendant's aunt, who testified that defendant's legal troubles began shortly after the death of his grandfather, that defendant's father was an alcoholic, and that defendant had a good relationship with his young daughter. Melanie Romero, defendant's mother, testified that defendant's father was an abusive alcoholic and that the death of defendant's grandfather affected him adversely. She further testified that defendant was unable to participate in some of the programs his probation officers had recommended, because they were unable to find transportation.

The presentence report indicated that defendant, who was born in 1986, had been adjudged a delinquent minor in 1999 for criminal damage to property, in 2001 for disorderly conduct, and in 2001 for aggravated battery. His probation was revoked in 2003 for failure to comply with the terms, and, also in 2003, he admitted to three counts of criminal damage to property from a January 2002 incident. The report also indicated that defendant admitted to having been a member of a street gang from 2000 to 2002.

After hearing argument from the parties and defendant's statement in allocution, the trial court imposed sentence as follows, in pertinent part:

"Court in determining sentence has considered evidence in the case, considered the Presentence Reports, consider[ed] the financial impact of incarceration ***, considered evidence of aggravation and mitigation, the positive and negative things about [defendant's] background. ***

* * *

Impact on the victim's family is the first factor I note. ***

* * *

I am mindful also there is [sic] mitigating factors and certainly an impact on [defendant's] family. And it is tragic to a lesser degree. It is a young man who will be incarcerated for a very long time. There are positive things the court has noted. He is very young. Very young at the time of the incident. [Defendant] did complete [drug/alcohol treatment]. He completed an inpatient abuse program showing the ability for rehabilitation in that instance. [Defendant] has a dependent daughter, a young child who [sic] he has a

good relationship with. [Defendant] has shown remorse by expressing his apologies to the victim. ***

The crime itself was not premeditated. It was spontaneous.

*** I feel that the State has presented insufficient evidence to use gang membership as an aggravating factor ***.

The defendant has a close family relationship. ***

[Defendant has] been *** disadvantaged to the extent of [his] father's role in [his] life. That's a mitigating factor. ***

* * *

I have considered in aggravation the baseball bat incident of August of 2004. I find it has been proven in demonstrating the violent nature of the defendant.

I do rely on the December 28, 2005, evidence. And even assuming the fight involved in jail was mutual and that [defendant was] not at fault for starting the fight, I find that [he] was combative and uncooperative with corrections officers. Once again, that impacts the court's evaluation of whether *** [defendant has] any rehabilitative potential.

[Defendant was] uncooperative with juvenile probation service[s]. *** [Defendant was] provided with substantial juvenile court assistance and services. And [he] didn't attend. [He] turned [his] back on it. Again affecting whether [defendant] will be a candidate for rehabilitation.

[Defendant] had poor behavior in school and poor attendance, finally dropping out. [Defendant has] a substantial history of prior delinquency including a sentence to the Department of Corrections as a juvenile.

* * *

And I look now to the nature of the offense. And I have to say that I reject [defendant's] self-defense position that [he has] taken in this case.

I am going to talk about the things [he] didn't do. First of all, [he] didn't leave the knife at home. What [he] also didn't do is [he] didn't leave it in [his] pocket and say look, I've got a knife, stay away from me. *** [He] didn't take the knife out of [his] pocket and say I've got a knife, stay[] away from me. [He] didn't slash in the air at someone and say stay away from me ***. [He] didn't slash at someone in a nonlethal way to warn them that way. *** [He] didn't only strike once. What [he] did is [he] struck three times in a lethal area of the body in a stabbing motion to kill somebody.

*** And I feel it was motivated not by self-defense but by the effects of rage. And that's been [defendant's] constant companion in life, rage. So the nature of the offense is also [a] substantial basis for which the court must decide the sentence. I feel that a substantial sentence to the Department of Corrections is necessary so as not to deprecate the serious nature of the offense. I feel that a substantial sentence *** is necessary to deters [sic] others in this kind of conduct. And I so then sentence [defendant] to fifty years in the Department of Corrections."

Defendant argues that his sentence violates the constitutional mandate that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, §11. As the State notes, "[a] sentence within statutory limits will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." People v.

Fern, 189 Ill. 2d 48, 54 (1999). A reviewing court must afford great deference to the trial court's judgment regarding sentencing because the trial judge, having observed the defendant and the proceedings, has a far better opportunity to consider such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, and habits. Fern, 189 Ill. 2d at 53. Thus, "[i]n considering the propriety of a sentence, the reviewing court must proceed with great caution and must not substitute its judgment for that of the trial court merely because it would have weighed the factors differently" (Fern, 189 Ill. 2d at 53), and it may not reduce a defendant's sentence unless the sentence constitutes an abuse of the trial court's discretion (People v. Streit, 142 Ill. 2d 13, 19 (1991)).

Defendant first notes that his actions occurred in the midst of a "big brawl" and thus were not premeditated but were taken in the face of provocation. The evidence at trial does not support this conclusion. Although Hatfield described seeing an argument between Flynn and defendant's group, and other witnesses testified to a brawl or a fight involving 15 or more people, no one testified to any acts of provocation by Flynn or his associates specifically directed at defendant. None of the witnesses testified that defendant was directly involved in the argument or brawl. Presumably, defendant was present and saw the action. But without evidence that defendant was directly taunted or threatened, the record does not support his claim that he was provoked. Moreover, the two persons closest to the action when Flynn was stabbed, defendant and his brother Daniel, both said they saw no weapon in Flynn's hand, which makes it less likely that defendant pulled out the knife in response to a personal attack. While defendant testified that Flynn hit him in the head, Daniel stated to the police that he did not see Flynn strike defendant, again making it less likely that defendant reacted to a personal attack. Defendant did not have any visible marks on his body from

allegedly being struck by Flynn, which calls into question defendant's version of events. Defendant admitted he did not attempt to run away from Flynn instead of stabbing him. Based on the evidence, we do not see any provocation of defendant by Flynn or anyone associated with him, much less any provocation sufficient to change the nature of the offense as the trial court viewed it and warrant a reduced sentence.

The trial court found that the killing was not premeditated. The evidence bears this out to the extent that defendant did not show up at the bonfire party with a preconceived plan to kill Flynn. However, "premeditation" is "a legal term of art meaning nothing more than ' "having made the choice to kill." ' [Citation]." People v. Williams, 193 Ill. 2d 1, 29 (2000). Flynn suffered five stab wounds. All but one were made by a double-edged blade that was consistent with defendant's butterfly knife. The one that was different, located under Flynn's left clavicle, could have been made in the course of medical treatment. The pathologist described a through-and-through knife wound that produced two separate cuts on Flynn's left arm. The pathologist could not determine whether those were defensive wounds. Another knife wound pierced the left lung. The pathologist testified that the fourth knife wound went through the sac covering the heart, into the left ventricular wall, "all the way through the left ventrical [sic] and actually went through the posterior portion of the heart." This wound was fatal and was delivered with "a deliberate force." The pathologist likened the force used to that needed to stab a knife through a roast. The pathologist testified, "[a]s any muscle, [the heart is] very tight, compact, so it takes deliberate force to do that." The pathologist opined that it also took deliberate force to pierce the lung, "although not as much."

We believe that the trial court inferred from the medical evidence that defendant, at some point before he stabbed Flynn, made the choice to kill and that thus his act, while spontaneous, was

calculated. That defendant did not premeditate the crime, in that he did not act pursuant to a preconceived plan or scheme, does not in our view reduce the seriousness of his actions in choosing to fatally stab Flynn through the heart rather than to deter Flynn (assuming deterrence was necessary) some other way. The trial court recognized this when it addressed defendant at the sentencing hearing and said:

"You didn't go for a nonlethal area of the body. You didn't do that. You didn't only strike once. What you did is you struck three times in a lethal area of the body in a stabbing motion to kill somebody."

Defendant's actions after he fatally stabbed Flynn do not bear out his claim that he stabbed Flynn as a reaction to provocation. He ran from the scene, threw the knife in the river, and lied to the police about stabbing Flynn. The trial court, in sentencing defendant, recognized that the circumstances did not dictate defendant's actions when he killed Flynn:

"You say to me bad things happen and you blame bad things. No. It's you. You brought the knife. You brought it out. You stabbed. It's not the circumstances. You can't blame that. So the nature of the offense is also [a] substantial basis for which the court must decide the sentence."

To support his argument that the circumstances of the offense warranted a lower sentence, defendant relies on four cases: People v. Steffens, 131 Ill. App. 3d 141 (1985); People v. Treadway, 138 Ill. App. 3d 899 (1985); People v. Newell, 196 Ill. App. 3d 373 (1990); and People v. Nolan, 291 Ill. App. 3d 879 (1997). Each of those cases is distinguishable.

The murder of Eric Flynn was unlike the murder that occurred in Steffens, where the confrontation was initiated by the victim and the murder was ultimately the result of a sudden

escalation of the encounter between the defendant and the victim's family. Steffens, 131 Ill. App. 3d at 152. In our case, although multiple witnesses testified to the chaos at the bonfire party, none of them except defendant himself and defendant's brother saw what led to Flynn's murder. Daniel's trial testimony was significantly impeached by his prior statements, and defendant's testimony that Flynn struck him was incredible. In the absence of credible eyewitness testimony that defendant was part of the confrontation, Steffens offers no support for defendant's position. Moreover, as the trial court pointed out, Flynn's death could have been avoided had defendant not chosen to bring the knife to the party and to take it out and go for lethal blows to Flynn's body.

Treadway is also distinguishable from the instant case, because it involved the imposition of three extended-term 60-year sentences for attempt murder, armed violence, and aggravated battery. In Newell, the defendant was mentally retarded, he was among a group of people involved in the shooting, someone else brought the gun used in the shooting, and the defendant did not know of the presence of the gun. Newell, 196 Ill. App. 3d at 383.

Finally, the victim in Nolan was the aggressor, and the defendant was attempting to back away and extricate himself from the situation when the gun in the defendant's possession discharged and killed the victim. Nolan, 291 Ill. App. 3d at 887. Nolan is also distinguishable from our case because it involved an extended term.

In sum, given the lack of credible evidence that Flynn provoked the attack and given the medical evidence, the trial court's conclusion that the circumstances of the crime were serious enough to warrant the sentence imposed was not unreasonable. See People v. Moreira, 378 Ill. App. 3d 120, 132 (2007).

Defendant next argues that the trial court failed to give adequate consideration to defendant's rehabilitative potential in light of defendant's "relative" lack of criminal history and his youth. We disagree. The trial court carefully considered defendant's rehabilitative potential and concluded that it was minimal. The record demonstrates that defendant had a lengthy juvenile history, including offenses of criminal damage to property, felony disorderly conduct, and aggravated battery while on probation. The record also discloses that defendant did not cooperate with his probation in that he failed to have contact with his probation officer, failed to attend classes, failed to attend anger management groups, and failed to follow through on a Rosecrance referral. The trial court considered these failures in assessing defendant's rehabilitative potential and stated:

"You were uncooperative with juvenile probation service[s]. So often I sit here and say a young man did not have the opportunity for services, we didn't intercede to help him, and he ended up in this court. But in your case the system didn't fail you. You failed the system. You were provided with substantial juvenile court assistance and services. And you didn't attend. You turned your back on it. Again affecting whether you will be a candidate for rehabilitation. You had poor behavior in school and poor attendance, finally dropping out. You have a substantial history of prior delinquency including a sentence to the Department of Corrections as a juvenile. Although you are very young, you have limited work history considering you weren't in school and you have a dependent child."

The trial court also considered a fight defendant had while in jail, finding that he was "combative and uncooperative with correction officers." The court additionally considered as reflecting on defendant's potential for rehabilitation the "baseball bat incident" of August 2004, in which defendant attacked a home with a baseball bat, smashing windows, a door, and the mailbox.

Defendant downplays the violence he used in the "baseball bat incident" by referring to it as "an uncharged property offense." The true import of the "baseball bat incident" was not lost on the trial court, however, which stated, "I find it has been proven in demonstrating the violent nature of the defendant." The trial court considered defendant's "substantial history of prior delinquency including [a] sentence to the Department of Corrections as a juvenile," along with defendant's demonstrated violent nature, in assessing whether defendant had "any" rehabilitative potential. The 50-year sentence of imprisonment reflects not only the trial court's findings with regard to the seriousness of the offense, but also the court's apparent conclusion that defendant possessed little rehabilitative potential.

Nor do we believe defendant's age merits a sentence reduction. We find People v. Evans, 373 Ill. App. 3d 948 (2007), closer to the facts in this case than the Steffens, Treadway, Newell, and Nolan cases cited by defendant. In Evans, the appellate court upheld the defendant's aggregate 100-year sentence for first degree murder despite the fact that the defendant was 19 years old when he committed the murder and despite his lack of an adult criminal record. Evans, 373 Ill. App. 3d at 969. The defendant in Evans, as in our case, had a juvenile history. Evans, 373 Ill. App. 3d at 968. Also as in our case, the killing occurred during a melee in which, the defendant claimed, he killed the victim in self-defense. Evans, 373 Ill. App. 3d at 955. The jury was instructed on first degree murder, self-defense, and second degree murder. Evans, 373 Ill. App. 3d at 955. In upholding the 100-year sentence (55 years for first degree murder and 45 consecutive years for discharging a firearm), the appellate court pointed out that the sentence was well within the statutory limits and that the trial court properly considered all factors in sentencing the defendant. Evans, 373 Ill. App. 3d at 969.

We agree with the dissent that People v. Stacey, 193 Ill. 2d 203 (2000), held that an appellate court may reduce a sentence that is within statutory limits only where it is so out of line with the spirit and purpose of the law as to constitute an abuse of discretion by the trial judge. Stacey, 193 Ill. 2d at 210. The dissent relies on the cases cited by defendant in support of his argument that his sentence was excessive, to buttress its position that defendant's sentence here should be reduced. We have already distinguished those cases.

While the dissent appropriates Stacey's analysis, where the court held that the "level of seriousness of the offense[]" did not warrant the sentence imposed (Stacey, 193 Ill. 2d at 211), in fact the dissent would have us substitute our judgment for that of the trial court. Apparently, this is because the dissent sees defendant's actions in murdering Flynn during the course of a heated melee at a homecoming bonfire party as not so serious. The trial court weighed the facts and circumstances surrounding the offense, but (unlike the dissent) it also simultaneously weighed the other prong of the constitutional limitation on sentencing, that is, defendant's rehabilitative potential. While we do not quarrel with the dissent's representation of the constitutional analysis that Stacey applied, the facts in Stacey were quite different from those here, and, in our view, do not suggest that a similar result should obtain.

In Stacey, the trial court imposed two consecutive 25-year sentences for momentarily touching the breasts of two young girls, over their clothing. Stacey, 193 Ill. 2d at 208. The sentences resulted from the defendant's prior Class 2 convictions, which made him eligible for Class X sentencing. Stacey, 193 Ill. 2d at 210. Our supreme court made a point of noting the classes of the crimes of which the defendant was actually convicted. Indeed, the trial court meted out such severe sentences for crimes that were only Class 2 felonies (one of which was an enhanced Class 2 felony),

which under other circumstances would not have carried such great punishment. In reducing the defendant's sentences, our supreme court held, "Although such behavior is appalling and harmful, it is not severe enough to warrant a 25-year sentence." Stacey, 193 Ill. 2d at 210. The unique facts that resulted in the excessive sentences in Stacey are not present in our case. Accordingly, we affirm defendant's sentence.

Defendant's final argument on appeal is that the trial court erred in imposing four years of MSR at the end of defendant's sentence. As the State concedes, the trial court was statutorily authorized to impose only a three-year term of MSR. See 730 ILCS 5/5--8--1(d)(1) (West 2004). We therefore agree with defendant that his sentence should be modified to reflect the statutorily authorized period of MSR.

For the foregoing reasons, we affirm as modified the judgment of the circuit court of Winnebago County.

Affirmed as modified.

BURKE, J., concurs.

JUSTICE O'MALLEY, concurring in part and dissenting in part:

I disagree with the majority's decision to affirm defendant's sentence. For the reasons that follow, I would reduce defendant's sentence to 35 years' imprisonment.

As the majority notes, our constitution requires that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, §11. Also as the majority notes, "[i]n considering the propriety of a sentence, the reviewing court must proceed with great caution and must not substitute its judgment for that of the trial court merely because it would have weighed the factors differently"

(Fern, 189 Ill. 2d at 53), and it may not reduce a defendant's sentence unless the sentence constitutes an abuse of the trial court's discretion (People v. Streit, 142 Ill. 2d 13, 19 (1991)).

The deference to be given a trial court's sentencing decision is well illustrated by our supreme court's decision in Streit. There, a defendant who had no prior criminal history, was gainfully employed, and showed remorse for her actions pled guilty to two counts of benefits fraud, which she had perpetrated in part to help make house payments and pay for clothes for her children. Streit, 142 Ill. 2d at 17. The State recommended that she be sentenced to 30 months' probation. However, the trial court imposed a sentence of two years' imprisonment. Streit, 142 Ill. 2d at 18. The appellate court reduced the sentence because, in its view, the trial court abused its discretion by "ignor[ing] compelling mitigating circumstances" and "rel[ying] on only one aggravating factor." Streit, 142 Ill. 2d at 19. The supreme court reinstated the trial court's sentence. In so doing, the supreme court offered no independent discussion of the factors in mitigation and aggravation, but instead simply observed that the trial court had considered several of each type of factor and that "it is the province of the trial court to balance these factors and make a reasoned decision as to the appropriate punishment in each case." Streit, 142 Ill. 2d at 20-21. Thus, Streit implies very strongly that a sentencing decision must be upheld on review so long as the trial court considers factors in mitigation and aggravation, regardless of what relative weight the trial court places on those factors.

However, even though the supreme court has indicated that a reviewing court has virtually no oversight over a trial court's weighing of the sentencing factors, it has also indicated that the trial court's discretion in sentencing "is not without limitation." People v. Stacey, 193 Ill. 2d 203, 209 (2000). As noted above, notwithstanding the discretion afforded the trial court in sentencing matters,

a sentence within the statutory limits "will be deemed excessive and the result of an abuse of discretion by the trial court where the sentence is greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." Stacey, 193 Ill. 2d at 210. Under those circumstances, a reviewing court is empowered under Supreme Court Rule 615(b)(4) (134 Ill. 2d R. 615(b)(4)) to reduce the sentence imposed by the trial court, because Illinois courts "must adhere to our constitution's mandate that penalties be determined according to the seriousness of the offense." Stacey, 193 Ill. 2d at 210-11; see Ill. Const. 1970, art I, §11 (sentences must be determined "both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship").

In Stacey, the supreme court invoked the constitutional mandate to reduce a defendant's excessive sentences. In reaching its holding, the court relied exclusively on "the nature of the crimes" to determine that the defendant's sentences were unconstitutionally excessive, and it expressly stated that it was not reweighing "any aggravating or mitigating factors." Stacey, 193 Ill. 2d at 210. The rule from Streit and Stacey, then, is that a reviewing court may not reduce a sentence based on the relative strength of the mitigating and aggravating sentencing factors but may reduce a sentence when, based on the nature of the crimes or the circumstances of the case, the sentence violates article I, section 11, of the Illinois Constitution. The question here becomes when a sentence within the statutory limits may be deemed so excessive as to trigger a reviewing court's constitutional obligation to provide relief. Defendant directs us to several cases that provide guidance.

In People v. Steffens, 131 Ill. App. 3d 141 (1985), the defendant and the eventual murder victim "had a verbal altercation regarding the speed of [the] defendant's car" outside the victim's home. Steffens, 131 Ill. App. 3d at 142. After the altercation, the defendant drove away, and the

victim entered his house. Steffens, 131 Ill. App. 3d at 142-43. However, the defendant later returned, and the victim and several members of his family went outside. Steffens, 131 Ill. App. 3d at 143. Though there was some conflict in the testimony, it generally showed that, after a short confrontation, the victim started to walk away from the defendant's car and the defendant accelerated, swerved toward the victim, hit the victim, and dragged him under the car for an appreciable distance (the victim died as a result). See Steffens, 131 Ill. App. 3d at 143-45. The trial court imposed a 30-year sentence (the midpoint of the then applicable 20- to 40-year range). Steffens, 131 Ill. App. 3d at 151. The appellate court reduced the sentence to 20 years. It reasoned as follows:

"In the present case, the offense was not a calculated murder. The confrontation between [the] defendant and the victim was initiated by the victim, and, even though [the] defendant returned to the scene apparently to cause some sort of trouble, the murder itself was the result of a sudden escalation of the encounter between [the] defendant and the victim's family. We particularly note the short period of time which elapsed, and, taken in context, the offense did not approach [a premeditated attack]." Steffens, 131 Ill. App. 3d at 152.

The court also noted the defendant's rehabilitative potential based on his youth (he was 16 at the time of the offense), his desire to continue his education, and his lack of a violent criminal history. Steffens, 131 Ill. App. 3d at 152-53.

In People v. Treadway, 138 Ill. App. 3d 899 (1985), the defendant was convicted of and sentenced for attempted murder, armed violence, and aggravated assault in connection with an incident in which he forced a female bar patron into a back alley, stabbed her repeatedly, and also slashed a man who came to her aid. The appellate court reduced the defendant's two concurrent 60-

year sentences to 30 years apiece, based primarily on the defendant's rehabilitative potential. Treadway, 138 Ill. App. 3d at 905. The court noted that the defendant was only 24 years old, had suffered from a drug and alcohol problem since a young age but was taking steps to improve, had only a "minor" criminal history (the court did not further describe the defendant's criminal history), had earned a high school diploma while awaiting trial, and was the father of a young child. Treadway, 138 Ill. App. 3d at 905. The court also briefly considered the nature of the offenses, which it concluded were "perpetrated in a fleeting moment of intoxicated rage upon a stranger." Treadway, 138 Ill. App. 3d at 905.

In People v. Newell, 196 Ill. App. 3d 373 (1990), the defendant was with a group of people who chartered a limousine and murdered the driver. The defendant was sentenced to 60 years' imprisonment, but the appellate court reduced the sentence to 30 years. The first expressed rationale the appellate court offered for reducing the sentence was that the nature and circumstances of the offense did not justify the penalty. The court summarized the point as follows:

> "[I]n the instant case, [the] defendant was amongst a group of people involved in a shooting, another member of the group brought the gun used in the shooting, and [the] defendant has repeatedly stated that he did not know a member of the group carried a gun the day of the murder. Taken in its proper context, we believe the defendant's actions do not compare to a calculated, premeditated murderer." Newell, 196 Ill. App. 3d at 383.

The court also noted that the defendant's age (he was 17 at the time of the offense) was an indicator of rehabilitative potential. Newell, 196 Ill. App. 3d at 383.

In People v. Nolan, 291 Ill. App. 3d 879 (1997), the defendant was convicted of second degree murder in connection with an incident in which he fatally shot a shopkeeper who suspected

the defendant of shoplifting and aggressively approached him, yelled at him, grabbed his wrist, and may have tried to search his pockets. In reducing the defendant's sentence from 30 years to 15, the appellate court reasoned as follows:

"As the defendant contends, the 'factual matrix surrounding the shooting' does not warrant a 30-year prison term. It is clear that [the shopkeeper] was the aggressor in the encounter ***. The evidence consistently showed that [the defendant] was attempting to back away from the encounter and extract himself from the situation. The shooting was not an act of plan or premeditation. Although [the defendant] was unable to prove [the shopkeeper] reached for the gun and the gun went off accidentally, this was a close case and [the defendant] carried his burden of proving mitigating factors that reduced the offense to second degree murder." Nolan, 291 Ill. App. 3d at 887.

The court also briefly observed that the defendant's two prior felony convictions did not indicate that he was "a dangerously aggressive criminal." Nolan, 291 Ill. App. 3d at 887.

The nature and circumstances of defendant's crime share many parallels with the above cases. Most significantly, the courts in Steffens, Newell, and Nolan specifically relied on the fact that the defendants' actions were not premeditated, and the court in Treadway relied in part on the idea that the defendant's actions were perpetrated in a "fleeting moment" of rage. Likewise here, though the evidence did not demonstrate facts sufficient to mitigate his crime to second degree murder, as the trial court noted, the evidence did not show that the act was premeditated in the sense that defendant conceived it before the brawl commenced. Nor was his act performed in cold blood--the testimony uniformly describes the escalating tensions among groups at the bonfire party. Like the defendant in Steffens, defendant here had suffered some provocation from either the victim or someone

associated with the victim, even if that provocation was insufficient to provide legal justification for defendant's actions. Further, like the defendant in Nolan and likely the defendant in Steffens, there was at least some threat of physical violence made towards defendant before he acted. While none of this serves to justify defendant's actions, it does serve to distinguish his crime from those that warrant maximum or near-maximum sentences. Defendant's 50-year sentence, which rests on the high end of the 20- to 60-year statutory range (see 730 ILCS 5/5--8--1(a)(1)(a) (West 2004)), is not commensurate with the circumstances; though all first degree murder cases are both tragic and reprehensible, I struggle to envision what factual scenario would justify a sentence lower than 50 years if this one does not.

In my view, the unique circumstances of this case compel the conclusion that the trial court's imposition of a 50-year term of imprisonment violates the constitutional limitations on criminal sentencing, as defendant's sentence is manifestly disproportionate to the nature of the offense. Pursuant to our power under Rule 615(b)(4), I would reduce defendant's sentence from 50 years to 35.

In so stating, I briefly address some points raised by the majority. The majority very strongly argues that, even if defendant did not "premeditate" the murder here, he "made the choice to kill" before stabbing Flynn. Slip op. at 33. Of course, I agree that defendant made the choice to kill or inflict serious harm--that conclusion is implicit, and required, in my agreement to affirm defendant's conviction of first degree murder. My point is that the circumstances of this murder do not warrant the sentence imposed. Thus, the majority does not undercut my position when it makes several statements directed at the ideas that the circumstances here do not excuse defendant's crime or that defendant acted with deliberate force. See slip op. at 32 ("both said they saw no weapon in Flynn's

hand, which makes it less likely that defendant pulled out the knife in response to a personal attack"); slip op. at 32 ("Defendant admitted he did not attempt to run away from Flynn instead of stabbing him"); slip op. at 33 ("defendant, at some point before he stabbed Flynn, made the choice to kill, and thus his act, while spontaneous, was calculated"). In response, I repeat that, if I disagreed with any of these statements, I would not vote to affirm defendant's conviction of first degree murder. The question I discuss above is whether the sentence imposed by the trial court was warranted; I would hold that it was not.

The majority also takes issue with the idea that defendant suffered some provocation, because, according to the majority, there was no credible evidence that there was any provocation "specifically directed at defendant." Slip op. at 32. However, the point that defendant suffered provocation is not that defendant confronted a direct threat (again, that would raise a serious question regarding whether we should affirm his first degree murder conviction), but that he was part of a group that became involved in an immediate and escalating, "in your face" confrontation with other partygoers, thus making this tragedy markedly different from, e.g., a drive-by shooting.

I understand that the majority considers a wider range of factors in affirming defendant's sentence than I do in arguing that it should be reduced. I offer two explanations for my more narrow analysis. First, I confine my analysis to the constitutional limitation applied in Stacey; I do not engage in a review of the trial court's overall sentencing determination based on all of the aggravating and mitigating factors the trial court was compelled to consider. My approach mirrors the approach taken in Stacey, where our supreme court held a sentence to be unconstitutionally excessive based solely on the nature of the offenses. See Stacey, 193 Ill. 2d at 210-11. Second, as noted above, our constitution provides two limitations on criminal sentencing: sentences must be

determined "both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, §11. A sentence must succeed on both of these tests in order to pass constitutional muster. I would hold that the sentence here fails the first test, regardless of how it measures on the second test.[4]

Based on the above analysis, I would reduce defendant's sentence to 35 years.

---

[4]That said, I observe that there are indicia of defendant's rehabilitative potential sufficient  to refute any argument that defendant's sentence, even if excessive in light of only the seriousness of the offense, was justified by his lack of rehabilitative potential. Here, just as in Steffens and Newell, defendant was very young at the time of the incident. Further, though defendant had a history of juvenile adjudications, I note that the only previous adjudication that could by its label be considered a result of violence, his aggravated battery adjudication, was aggravated not because it involved a weapon but because it took place on a public way. See 720 ILCS 5/12--4(b)(8) (West 2000). Additionally, like the defendant in Treadway, defendant is the father of a young child and had taken some positive steps (though, as the dissent notes, not all possible positive steps) in alcohol and drug treatment programs. Under applicable truth-in-sentencing laws, defendant is required to serve 100% of his sentence without any credit for good conduct. See 730 ILCS 5/3--6--3 (West 2004). Thus, if defendant's 50-year sentence were to stand, defendant would be released at age 68, having spent almost three-fourths of his life in prison. Such a sentence does not advance the constitutional objective of returning offenders to useful citizenship.